ROBERT LOWENSTEIN, APPELLANT, v. NEWARK BOARD OF EDUCATION, RESPONDENT.

Argued April 4, 1960—Decided July 18, 1960.

278

*Mr. Morton Stavis* and *Mr. John O. Bigelow* argued the cause for appellant.

*Mr. Jacob Fox* argued the cause for respondent.

*Mr. David D. Furman,* Attorney General, filed a statement in lieu of brief on behalf of the Commissioner of Education of the State of New Jersey (*Mr. Murry Brochin,* Deputy Attorney General, of counsel).

The opinion of the court was delivered by

HALL, J. The appellant was one of the three Newark school teachers whose dismissals by the city board of education in 1955 were set aside by the State Commissioner of Education and that action affirmed by this court in *Laba v. Newark Board of Education,* 23 *N. J.* 364 (1957). The dismissals had been grounded on the teachers' refusal, in reliance on the Fifth Amendment of the United States Constitution, to answer questions, particularly as to their past and present Communist membership and association, posed by a subcommittee of the Un-American Activities Committee of the federal House of Representatives in the course of a hearing in Newark on May 19, 1955, investigating the current leadership of the Communist Party in the New Jersey area and infiltration in the fields of labor and education. The board concluded that invocation of the privilege against self-incrimination in such an inquiry in itself constituted conduct unbecoming a teacher and justified dismissal under *R. S.* 18:13–17.

The reversal was based on *Slochower v. Board of Education,* 350 *U. S.* 551, 76 *S. Ct.* 637, 100 *L. Ed.* 692 (1956), rehearing denied 351 *U. S.* 944, 76 *S. Ct.* 843, 100 *L. Ed.* 1470 (1957), handed down after the Board action, which held that violation of due process of law occurs where a discharge from public employment is based solely upon exercise of the privilege before a congressional investigating committee whose inquiry was not directed at the witness'

fitness or conduct in his employment. Mr. Justice Clark pointedly said: "The privilege against self-incrimination would be reduced to a hollow mockery if its exercise could be taken as equivalent either to a confession of guilt or a conclusive presumption of perjury." 350 *U. S.*, at *pp.* 557–558, 76 *S. Ct.*, at *p.* 641, 100 *L. Ed.*, at *p.* 700.

The *Laba* decision, did not, however, direct reinstatement of the teachers, but continued their suspension without pay and ordered a remand of the matter to the local school authorities. The purpose of the remand was to enable a full and fair inquiry as to their continued competence and fitness to teach, which it was pointed out was called for by their conduct before the subcommittee. The purpose, scope and governing principles of that inquiry and any subsequent proceedings were set forth generally in the following portion of the opinion:

"In the light of our controlling legislation it is clear that in this State any person who is now a member of the Communist Party or who is now subject to its ideologies and disciplines is unfit to teach in our public schools and should be dismissed under *R. S.* 18:13–17. See *R. S.* 18:13–9.1; *R. S.* 18:13–9.2. * * * The matter may no longer be viewed simply as one of academic freedom of thought and expression, for it has actually become one of self-preservation; we are convinced that Communism is an alien concept which is dedicated to the overthrowal of our form of government, by force if necessary, and seeks to deprive us of the very basic constitutional liberties which we all hold so dear; recent world happenings furnish further evidence of the futility of its solemn promises and the barbarism of its deliberate actions. We have no doubt that in examining into their continued fitness to teach the Newark school authorities may interrogate the appellant school teachers with respect to their present and past association with the Communist Party and affiliated organizations and are entitled to frank and full disclosures. Orderly procedure dictates that the preliminary inquiry on the subject be made fairly and conscientiously by the local school superintendent (*R. S.* 18:4–7; *R. S.* 18:4–10; *R. S.* 18:6–38); his interrogation may also include questions about the teachers' conduct before the House subcommittee, although this inquiry should not be used as a means of undoing the acknowledged constitutional protection of the Fifth Amendment but should be fairly limited and directed towards ascertaining whether the refusals to answer were patently contumacious

or frivolous rather than in good faith * * *. If after the inquiry it appears that the teachers are now members of the Communist Party or are now subject to its ideologies and disciplines * * * or that they have willfully refused to answer pertinent questions' fairly submitted by their administrative superiors * * * or that they have contumaciously or frivolously refused to answer before the House subcommittee * * * then there would seem to be ample basis for board action within the broad and valid statutory standard embodied in *R. S.* 18:13–17." (23 *N. J.*, at *pp.* 388–389).

██ In the course of the superintendent's inquiry which followed in May 1957, appellant denied any Communist membership or activity presently and for a period of something less than two years prior to his 1955 appearance before the subcommittee. While he answered some questions relating to matters back of that time, for the most part' he refused to respond to such queries, not on the ground that he might incriminate himself, but rather on a claim of remoteness and irrelevance to his present fitness to teach and of an improper invasion of his right of privacy and personal dignity. It should be noted that, after appellant told the superintendent he had claimed the privilege before the subcommittee on the advice of counsel, that subject was quite properly not pursued further. The matter of contumacious or frivolous refusal to answer as a basis for disciplinary action was thereby permanently removed from the case and nothing remained with respect to the original charges.

After the interview the superintendent preferred "supplementary" charges (actually new ones) asserting that appellant's unjustified refusals to answer questions claimed to be pertinent, particularly those relating to past Communist association, amounted to insubordination and conduct unbecoming a teacher, impeded an inquiry to determine whether he was on May 19, 1955 or since a member or subject to the ideologies and disciplines of the Communist Party, and rendered him since that date unfit to teach in the Newark public schools. The board sustained the charges

after a hearing and ordered dismissal as of May 20, 1955, the day after appellant's appearance before the subcommittee and suspension. Mention should be made that at the hearing the board denied an application to dismiss the original charges. While no special point is made of it before us, we may say that the motion should have been granted since, as has been said, no basis remained to support a claim of any improper conduct before the subcommittee.

· The Commissioner sustained the dismissal, holding in effect that membership in the Communist Party "at any past time" may always be inquired into as relevant to the question of present subjection to its ideologies and disciplines and of present fitness to teach. However, he made the effective date the day in 1957 on which the refusal to answer the superintendent's questions occurred and awarded the appellant back pay from the date of suspension to that of the interview. Appellant sought review of the dismissal affirmance and the board cross-appealed from the modification relating to the effective date. The case is before us on our own certification prior to argument in the Appellate Division.

The present controversy, revolving as it does around the matter of whether, in the language of *Laba,* the disputed questions were "pertinent," seems to us to have been occasioned by misapprehension on both sides of some of the import of what was there said about the scope of the inquiry, with the result that neither the course of it nor the approach to it conformed to what we intended, despite our belief that all persons involved undoubtedly made every effort to comply with the mandate as they understood it. A brief reiteration of basic principles will demonstrate what we mean.

The right, in fact the duty, of a public employer to interrogate his employee, and the latter's obligation to respond fully and frankly, arise when the employer learns from any reasonable source of possible misconduct of any kind, which if true, would adversely affect his continued fitness to hold his position. What transpired at the subcommittee hearing, particularly the refusal to answer as to

present party membership, gave rise to the necessity for such an inquiry here. The right to interrogate is only for the purpose of enabling the employer to judge whether there is a reasonable ground for the bringing of dismissal charges on the basis of the employee's answers to relevant questions and of any other information at hand. It is not a broad investigation such as a legislative committee conducts, a trial or an adversary proceeding in the usual sense. Nor is it to be considered an end in itself or as a primary method of dismissal, absent clear lack of cooperation or willful refusal to answer pertinent queries.

Here the inquiry was to aid in determining whether there was sufficient basis to charge that appellant was unfit to teach because subject to the ideologies and disciplines of Communism. Subjection connotes such belief in the overthrow of our government by force or other unlawful means and in the substitution of a totalitarian state with destruction of all of our heritage of individual freedoms as to be subservient to commands to act in any way directed to carry out these nefarious purposes. It is essentially a state of mind, admittedly difficult to determine extrinsically but generally evidenced sufficiently by knowing membership and participation in true Communist organizations and activities designed to further the basic aim of such violent overthrow of our government.

The focal point of the inquiry in the instant case was such subjection now rather than in the past. It is not suggested by the board that any past conduct of appellant would be of a nature that in itself would justify dismissal even if there were no present subjection, so we are not called upon to determine under what circumstances, if any, the right to discipline would exist in such a situation and what we are about to say further is directed particularly to the precise situation before us. In fact, the board's brief specifically says that the "fitness inquiry * * * involved not only the question of *present* party membership but also the question of *present* subservience to the Party's 'ideolo-

gies and disciplines'" (emphasis supplied), and at oral argument the board's counsel expressly agreed with the proposition that no right to dismiss exists merely because a teacher was a member of the Communist Party in the past when it is clear that he is not presently. Such a view follows state policy as expressed in the educational oath statute (*N. J. S. A.* 18:13–9.1 and 9.2) where the criterion is present allegiance. *Cf. Schware v. Board of Bar Examiners,* 353 *U. S.* 232, 246, 77 *S. Ct.* 752, 1 *L. Ed.* 2d 796, 805–806 (1957).

We therefore had in mind that the obviously relevant and primary questions should be directed to whether the employee is so subject, whether he is a knowing member or active participant in Communist organizations and causes, and what his belief is toward American democratic principles, ideals and institutions. Questions relating to past conduct have no intrinsic relevancy and are not automatically proper in every case, as we will more fully explain shortly. On this score we think the Commissioner erred in holding to the contrary as an absolute proposition, as well as in suggesting that the failure fully and frankly to answer any questions asked by the employer, apparently whether or not relevant or material to the subject of inquiry, evidences secretiveness and lack of candor, thereby stamping the individual as not qualified to occupy a teaching post. Prior event queries may not be posed just for their own sake and one cannot be compelled involuntarily to bare one's soul as to the past for that reason alone. Relationship to the object of the inquiry must appear. And that relationship can be found in this kind of situation only where the employer sincerely doubts or has good reason in his own mind to test mere denials of present belief or affiliation. Then exploration of the past becomes pertinent to aid the interrogator in coming to a conclusion as to the truth of the present.

It was in this context and to this extent that we spoke of the right to inquire into past as well as present asso-

ciation with the Communist Party and affiliated organizations in our prior opinion (23 *N. J.*, at *p.* 388). Seemingly pertinent expressions by the United States Supreme Court (*e. g.*, *Garner v. Board of Public Works of Los Angeles,* 341 *U. S.* 716, 720, 71 *S. Ct.* 909, 95 *L. Ed.* 1317, 1322–1323 (1951), rehearing denied 342 *U. S.* 843, 72 *S. Ct.* 21, 96 *L. Ed.* 637 (1951); *Beilan v. Board of Education, School District of Philadelphia,* 357 *U. S.* 399, 409, 78 *S. Ct.* 1317, 1324, 2 *L. Ed. 2d* 1414, 1433 (1958)) must be considered in their context. In those cases the court upheld dismissals as not in violation of the Constitution where the employee refused to respond to any inquiry as to his Communist activities, present or past, and thus blocked all inquiry, as the court said in *Beilan,* "however relevant to his present loyalty." (357 *U. S.*, at *p.* 405, 78 *S. Ct.*, at *p.* 1321, 2 *L. Ed. 2d,* at *p.* 1420). In none of them can relevance of questions regarding past conduct to present loyalty be said to have been truly in issue, as it is here.

To put more concretely what we intended where the vital question is, as we have said, present subjection, if the employee admits present guilt, so to speak, that obviously ends the inquiry. If he answers all questions relating to current status in the negative and the employer has no reason whatever, either because of other information in his possession or of skepticism as to whether the answer should be believed from the general standpoint of credibility, to doubt the full truth and sincerity of the denials and does not feel the need to test them, the inquiry must also end. But if the inquirer has honest doubts, or other information at hand seems inconsistent with the present disavowal so as to indicate the need for test and further query, he is privileged to probe backward from the date of the interview, for past conduct then becomes relevant to the present. When such a course is indicated, and the interviewer decides to pursue it, he must, in fairness to the employee, tell him so and why, including a statement of the substance of

information he may have from other sources if he intends to question further on the basis of that information, together with a general description of those sources. This is in order that the employee may have a sufficient basis to determine, at his risk, whether the further questions must be answered and also so that any reviewing tribunal may have a sound basis on which to determine any contention of irrelevancy. Such a disclosure by the employer will also give the opportunity, which fairness demands, for the employee to try to convince his interrogator and that the outside information mentioned is, for example, false and nothing but scurrilous gossip. Moreover, in any event, the employee should always be given the chance, apart from the answers to specific questions, to make his own statement to the interviewer, by way of explanation or otherwise, to attempt to explain away any claim or suggestion of wrongdoing or of unfitness to continue in his position. Even a justified backward inquiry into past conduct has its necessary limits. When denials of any wrongful conduct at a prior date reach the point in time where it becomes reasonably clear that the employee's assertion of present rectitude is sincere and truthful, further probe would be capricious and must cease. This, we think, ordinarily rules out a question, for instance, directed to whether the employee "ever" was a member of the Communist Party. Of course, it is so self-evident that it seems unnecessary to add, that once a basis of relevancy is established as we have outlined, it is absolutely obligatory on the employee to answer.

We come to the specific application of the principles we have discussed to the interview and board hearing before us for review. The reasons assigned by appellant on both occasions for his refusal to answer certain questions concerning affiliations and activities prior to July 1, 1953 are untenable, but, in the interest of complete fairness, we are willing to assume that his position was taken in reliance on an honest misconception of the import of *Laba* with

respect both to relevancy and fitness. Passing over the matter of any effect to be given to the fact that the refusal did not extend to all prior event questions, it seems clear that mere alleged invasion of privacy and personal dignity can constitute no bar to an inquiry of this type, if the questions posed are otherwise proper and appropriate. The subject is much too vital today to depend upon such personal views, however sincerely held. The matter is not simply one of academic freedom of thought and expression. As was so well said by Justice Heher in *Thorp v. Board of Trustees of Schools for Industrial Education*, 6 *N. J.* 498 (1951):

"The maintenance of the purity of the educational process against corruption by subversive influences is of the highest concern to society. * * * Loyalty to government and its free democratic institutions is a first requisite for the exercise of the teaching function. Freedom from belief in force or violence as a justifiable weapon for the destruction of government is of the very essence of a teacher's qualifications." 6 *N. J.*, at *p.* 513

See also *Adler v. Board of Education*, 342 *U. S.* 485, 493, 72 *S. Ct.* 380, 96 *L. Ed.* 517, 524 (1951). Any concept of individual privilege against intrusion on privacy and conscience must give way in these times and these situations to the greater public interest.

Nor is there any legal justification for a teacher under inquiry to set an arbitrary date beyond which he will not speak on the ground of conclusive irrelevancy. There is no absolute lack of pertinency arising from a mere date, any more than there is automatic relevancy. Appellant's position in this respect misconceived not only the applicable concept of relevancy as previously outlined but also that of fitness to teach. He argues irrelevancy of events back of the date he fixed on the ground that only his professional and academic record in that yonder period can have any bearing on his current fitness. But, we repeat, the kind of fitness with which this inquiry was concerned was present subjection to Communist ideologies and disciplines. As to

that, pedagogical or academic proficiency presently or at any past time has little bearing.

Looking at the other side of the coin and conceding every desire to follow *Laba,* the difficulty we find with the interview, again assumedly the result of misapprehension, is that nowhere does it clearly appear that the superintendent went into past affiliations and activities because he had reason to doubt or test the truthfulness of appellant's denials of present party membership or allegiance. While such may well have been the reason, he never expressly said so, even when answers were refused on the ground of remoteness and irrelevancy, and we cannot find sufficient from the context to warrant a plain enough inference. Our difficulty is compounded because for the most part questions as to the present came very late in the interrogation following inquiry as to the past and the interview did not follow the general pattern contemplated by *Laba.* The course and content indicated a close adherence to the general investigatory hearing held by the subcommittee, and a considerable part of the inquiry would not seem to have any materiality at all, even approaching the possibility of suggestion of guilt by mere association. Consequently, we cannot be assured that the present record sufficiently establishes that the inquiry as to the past was not for that sake alone, which it must demonstrate before the conclusion can be reached that appellant wrongfully refused to answer pertinent questions so as to warrant his dismissal on that ground. It may also be added that the interrogation did not explore the matter of appellant's present beliefs with respect to our democratic principles and institutions. This important factor was not mentioned in the case, despite his counsel's advance request that the superintendent go into it, until, on cross-examination at the board hearing, appellant volunteered his disbelief in the overthrow of the government by force and his adherence to American doctrine.

Since both sides appear to have been acting under a misapprehension, we feel that we should not sustain the dis-

missal, but we definitely believe the public interest would not be served by directing appellant's reinstatement while his fitness to teach remains unresolved. The ends of justice and the desire to be certain of complete fairness to the superintendent, the board, the public interest and the appellant dictate that we reverse the Commissioner's affirmance of the dismissal and remand the matter to the board so that a new inquiry may be pursued, to be conducted and participated in by both the superintendent and appellant in accordance with the principles we have expressed. Thereafter such new charges may be preferred and determined as the situation indicates.

What we have said has its roots much deeper than mere niceties of procedure or so-called technicalities of the law of evidence. The most fundamental of a reviewing court's duties is to see to it both that the end result in a case is just and correct and that the means utilized are fair and proper. Such is the essence of due process of law. This truism is particularly apt in cases with loyalty connotations where feeling is likely to run high and may tend to trample upon fundamental considerations of fairness and justice. In protecting democratic government we "must do so without infringing the freedoms that are the ultimate values of all democratic living." *Wieman v. Updegraff*, 344 *U. S.* 183, 188, 73 *S. Ct.* 215, 97 *L. Ed.* 216, 220 (1952). While the opprobrium of dismissal from public employment for true disloyalty is deserved if fully and fairly proved, the stain is so deep and the consequences so devastating (the same holds true where the dismissal is for refusal to answer questions relating to loyalty) that the very fibre of every constitutional right we seek to preserve, as well as every consideration of civilized human decency, dictate that this brand of infamy shall never be implanted without complete understanding on all sides of applicable principles, abundant proof and every requisite of due process. Such grievous guilt can never be found from mere association or simply on suspicion, by innuendo or through alleged inference from

truly non-relevant facts. *Cf. Wieman v. Updegraff, supra; Kutcher v. Housing Authority of the City of Newark,* 20 *N. J.* 181 (1955). A back door or indirect approach cannot be approved to disguise the real basis not directly and properly proved. See the dissenting opinion of Mr. Justice Brennan in *Beilan, supra* (357 *U. S.,* at *p.* 417, 78 *S. Ct.* 1328, 2 *L. Ed.* 2d, at *p.* 1437) and the very recent opinion of the Pennsylvania Supreme Court in *Board of Education School District of Philadelphia v. Intille, Pa.,* —— *A.* 2d ——. While we do not suggest that the proceedings at the local level here under review had such an object, this court must insist on every precaution to make certain that there can be no possible doubt on the subject and that such never can occur. Else none of us can be certain of any freedom.

This disposition makes it unnecessary to pass upon the question of the Commissioner's modification of the effective date of dismissal raised by the board's cross-appeal. Also we are of the opinion that the determination of all questions concerning back pay should more properly await the final outcome of the matter and so the Commissioner's award thereof is also reversed.

It is very apparent that this case has already consumed an inordinate amount of time. It is more than five years since appellant was suspended. It took the board almost a year and a half after the decision in *Laba* to act finally on the remand, and it was about another year before the administrative appeal was decided. This is much too long a time when a question of important public interest is involved and an individual is in an unsettled status concerning his position. In order that the controversy may now be finally disposed of without further undue delay and in the manifest interests of justice, we will retain jurisdiction and direct that all additional proceedings by and before the board be completed within 60 days from the coming down of our mandate. Should the result be unfavorable to appellant and an appeal is desired, notice of appeal to the Commissioner shall be filed within ten days of the board's final action and

the latter shall endeavor to make his determination within 30 days thereafter. Either party may then appeal directly to us within ten days.

The action of the Commissioner of Education is reversed and the cause is remanded to the Newark Board of Education for further proceedings in accordance with this opinion. No costs.

*For reversal*—Chief Justice WEINTRAUB, and Justices BURLING, JACOBS, FRANCIS, PROCTOR, HALL and SCHETTINO—7.

*For affirmance*—None.