**UNITED STATES of America**
v.
**John RISPO, Appellant in No. 71–1413, et al.**

**Appeal of Robert RISPO, in No. 71–1414.**

**Nos. 71–1413, 71–1414.**

United States Court of Appeals, Third Circuit.

Argued Nov. 8, 1971.

Submitted Jan. 17, 1972.

Decided May 19, 1972.

Stanford Shmukler, Philadelphia, Pa., for appellants.

Robert E. Lindsay, Richard T. Spriggs, Sp. Atty., U. S. Department of Justice, Philadelphia, Pa., Roger A. Pauley, Atty., United States Department of Justice, Washington, D. C., for appellee.

Before VAN DUSEN and JAMES ROSEN, Circuit Judges, and LAYTON, Senior District Judge.

## OPINION OF THE COURT

JAMES ROSEN, Circuit Judge.

Appellants John and Robert Rispo were found guilty of conspiring to unlawfully possess goods known to have been stolen from interstate commerce in violation of 18 U.S.C. § 371. In addition, appellant John Rispo was found guilty of the substantive offense of unlawfully taking and carrying away goods stolen from interstate commerce in violation of 18 U.S.C. § 659.

The charges arose out of the removal of a tractor trailer containing televisions and radio-phonographs worth approximately $30,000 from the Oneida Motor Freight Company terminal in Pennsauken, New Jersey, during the night of July 31, 1969. In addition to the appellants herein, four other defendants participated at various times in the events leading to the subsequent indictments, and prior to the trial, two of the defendants, Stanley L. Cohen and Harold F. Liss, pleaded guilty and agreed to testify as government witnesses against the remaining defendants, the two Rispo brothers and defendants Frank Alamia and William Calafaty.[1]

On January 11, 1971 at a pre-trial conference at which the trial judge, counsel for the government and all of the defendants were present, disclosure was made of a possible conflict of inter-

---

1. With the exception of Frank Alamia, all of the defendants were indicted for both the substantive offense of unlawfully taking goods stolen from interstate commerce and for conspiracy to do the same. The defendants were sentenced to the following terms:

   John Rispo, 3 years on Count 1, 2 years on Count 2, sentences to run consecutively;

   Robert Rispo, 3 years on Count 2;
   Harold Liss, indeterminate suspended sentence, 2 years probation;
   Frank Alamia, indeterminate suspended sentence, 2 years probation;
   Stanley Cohen, indeterminate suspended sentence, 2 years probation.

est in the joint representation of the Rispos by Mr. Fitzpatrick, a well known trial lawyer. He had previously represented defendant Stanley Cohen prior to and during arraignment proceedings, and might be required to cross-examine his former client about prior communications between them and possibly be obliged to testify about those communications with his former client. The trial judge nevertheless felt sure that since defendant Cohen was then represented by different counsel, any prejudice which might occur could properly be raised by respective counsel.[2] The court made no inquiry of appellants and did not seek their approval of the continuing representation by Mr. Fitzpatrick.

The trial took place on February 23, through 26, 1971. Only one defendant, Alamia, testified in his own behalf. Four witnesses testified for the Government, but only the testimony of the two defendants, Liss and Cohen, had a direct bearing on the movements of the other defendants after the tractor trailer was discovered missing on August 1, 1969.

It appears from the record that Stanley Cohen and Harold Liss had known each other for five years. On July 31, 1969, while Cohen was visiting Liss at his home, Liss received a phone call instructing him to meet a maroon Chrysler and a truck with the word "Oneida" on it at a location in Philadelphia. The meeting took place as planned, and Liss and Cohen then proceeded to follow the truck and the dark sedan to a Gulf service station where defendant Alamia was employed. Cohen testified that during the trip he had occasion to view the driver of the auto for a brief span, and although he did not know the driver at that time, he was given an opportunity at a later court proceeding to observe John Rispo at which time defendant Liss told him John Rispo's name.[3] He also

---

2. Before Mr. Fitzpatrick entered his appearance for the Rispos, and shortly after their arraignment, he questioned Cohen about any information the latter had which could be used to implicate the Rispos. Cohen informed Mr. Fitzpatrick that "he did not know the Rispos; that he had never involved the Rispos; that no one had ever mentioned their names; that he had been asked such questions but that there was absolutely no testimony that he could give about the Rispos." Transcript of hearing on January 11, 1971, pp. 5, 6. Judge Wood felt that cross-examination would suffice to bring out any inconsistency in Cohen's testimony, and expressed doubt as to whether Mr. Fitzpatrick would testify, at least in his court. When the Government attorney pointed out that the Rispos could argue prejudice on the occurrence at trial of contradictory testimony by Cohen, Judge Wood replied: "We will cross that bridge when we get to it." (Tr. p. 10). In any event, Judge Wood noted that all defendants were now represented by separate counsel and that if there was any error or prejudice it would be raised by respective counsel: "If there is error or if there is prejudice, why, it will be raised. Knowing Mr. Walsh and Mr. Fitzpatrick I don't think they will overlook anything, and that is all there is to it." (Tr. p. 10).

3. Trial transcript, first and second day, p. 62. Mr. Fitzpatrick's cross-examination of Cohen elicited the following testimony:

"Q. Now, after you became sure in your mind from this court hearing that Mr. Rispo was the man that you saw at the gas station, did you tell the Federal Bureau of Investigation that fact?
A. No.
Q. You did not tell them?
A. I don't think so, no.
Q. Did you ever identify Mr. Rispo by name to the Federal Bureau of Investigation?
A. I don't believe so, no. I don't think so.
Q. Defense counsel in this case has been furnished with three copies of interview reports given you to the F.B.I. One is dated August 5, 1969, one is dated February 16, 1970 and one is dated June 25, 1970. Do you recall on any of those occasions telling the Federal Bureau (sic) Investigation that you were certain of the identity of the man at the gas station?
A. I can remember I had no intentions of informing on anybody.
Q. You had no intentions of informing?
A. I had no intentions of informing.

testified that he thereafter saw the driver of the car at the Gulf station where they stood at some distance from each other and he only saw him for a short time. After the car and the truck arrived, the drivers of the tractor and of the car went into a diner and Liss joined them, while Cohen remained to speak with Alamia. Alamia had already agreed to have the truck kept in the back of the gas station during the night. Later, Liss and Cohen left the gas station and spent the rest of the night trying to dispose of the contents of the truck. Their efforts were not successful, and Cohen returned home at approximately 3 A.M. after promising to meet Liss at 6 A.M. that morning. He did not keep this appointment, and broke several other scheduled meetings during the course of that day. Liss then called defendant Calafaty and sought his help in transferring the contents of the trailer to three small rented trucks, for which Calafaty was to receive $200. or $300. for the day's work. The trucks were loaded and defendants Liss and Calafaty proceeded to Cohen's home, where Cohen's wife let them in and allowed them to put the merchandise in the garage and basement. When Cohen returned, Liss, Cohen and Calafaty reloaded the trucks and drove them to Westville, N. J. where one Mort Taylor offered to help find a buyer for the merchandise. Taylor was unable to find a buyer, and Cohen was then sent to Philadelphia to get $6,000. to make partial payment to the Rispos. Cohen returned home, and rented another truck in order to remove the remaining merchandise from his house. As he was leaving with the truck, he was arrested by the F.B.I..

After his arrest, and on the following day, Cohen testified that he received a phone call from a person who identified himself as Bobby Rispo. The caller allegedly demanded payment by Cohen of $6,800. and when Cohen protested, threatened reprisals against his family. The admission of this testimony produced a motion for mistrial by Mr. Fitzpatrick (representing the Rispos), because Cohen stated that he was unable to identify Robert Rispo's voice, never having spoken to him before. The motion was denied.

Liss' testimony varied somewhat from Cohen's account. He stated that when Cohen and he arrived at the Gulf station, a meeting was held at a diner across the street at which both of them, as well as Alamia, the drivers of the tractor and the car were present. A discussion took place at that time about painting out the "Oneida" sign on the trailer. Liss was unable to identify the driver of the car or the truck at the trial.

Alamia testified that he had never seen a maroon Chrysler on the date in question, and that it was Liss, Cohen and the driver of the truck who went into the diner, while Alamia remained at the gas station.

After the verdicts were returned, motions for acquittal and new trial were filed by Mr. Fitzpatrick, and were denied. After sentences were passed, and bail was increased, he withdrew his appearance on behalf of both appellants.

On August 23, 1971 counsel for appellants and for defendants Alamia and Calafaty were informed by Robert C. Ozer, Special Attorney, United States Department of Justice, that defendant

---

Q. What changed your mind, Mr. Cohen?

A. My attorney, Mr. Walsh.

Q. When was it that your mind was changed?

A. When I got Mr. Walsh as an attorney. * * * "

Mr. Walsh entered his appearance for Mr. Cohen on September 22, 1970. On May 12, 1970, the record indicates that

Stanley Cohen entered a plea of not-guilty. He subsequently changed his plea to guilty on Count 2 on February 23, 1971. The alleged conversation between Mr. Fitzpatrick and Cohen during which Cohen indicated that he knew nothing about the Rispos, must have occurred on or about May 26, 1970, the date of arraignment of John and Robert Rispo.

William Calafaty had been a paid Government informant prior to, during and subsequent to the trial; that he had been charged in both counts of the indictment with crimes in which the Government knew Calafaty's participation to be that of a paid Government informant; and that the Government permitted the trial to proceed without informing defendants, their counsel, or the court that Calafaty's participation in the caper was at the request of the Government, and in pursuance of his function as a paid Government informant.[4]

Trial counsel for Calafaty, who was unaware until the middle of the trial that his own client was a paid informer, filed a motion for a new trial on the ground of newly discovered evidence. This motion was disposed of at the hearing of October 5, 1971.[5]

On October 5, 1971, the Government appeared before the trial judge in open court, acknowledged that Calafaty was a paid informant and not guilty of the charges, and joined a request for a verdict of acquittal which was granted.

An offer by the Government to stipulate that the case be remanded to the trial judge to determine whether any prejudice had occurred was rejected by the appellants, but was accepted by defendant Frank Alamia, and a hearing was held in the district court on October 7, 1971. The trial judge stated that he regarded the matter as an evidentiary hearing on defendant Alamia's renewed motion for a new trial and motion for judgment of acquittal. He reserved decision pending the filing of memoranda by the parties. From the outset of the hearing, the court made it clear to Alamia's attorney that the burden of showing prejudice rested squarely with the defendant.[6]

---

4. Judge Wood granted Calafaty an acquittal after the following disclosures were made by Mr. Ozer:

"Mr. Ozer: * * * it is quite clear and has been clear really from the outset that Mr. Calafaty was never guilty of the crime for which he was convicted. At the time he participated he was doing so with the approval and I suppose at the direction of the F.B.I. When I say at the direction, I do not mean that all of his acts were directed but that they knew he was doing it and that he was working with them and for them. That being the case it would be appropriate, I think, in this rather exceptional circumstance for the court *now that there is no longer a need to conceal what the situation was* to enter a judgment of acquittal, which the court has jurisdiction to do." (Emphasis added) Transcript of hearing, October 5, 1971 pp. 2, 3.

5. Judge Wood noted that technically, the motion for new trial was merged in the judgment of acquittal that was entered on behalf of Mr. Calafaty by agreement of the Government.

6. "Mr. Carroll (Voluntary defender; attorney for Alamia): I take it that the court has ruled, then, that it is our burden to go forward?
The Court: That is right, definitely. He has been convicted. He never moved for a new trial, and if you want to convince me that what happened at the trial and the admitted fact that this gentleman was an informant—and it is a matter of public record in a collateral proceeding—that what he did was done by direction of the FBI, why, if they are the facts, or if there are any other facts you want to prove, if that shows that he was prejudiced because of being co-indicted with Mr. Calafaty, why, that is up to you to convince me. * * *
* * * * *
The Court: It is essentially a legal question.
Mr. Carroll: But the posture of this matter is that a paid informant was a co-defendant in the case.
The Court: That is all in the record.
Mr. Carroll: Yes, sir, but I want to know why the Government did that. Why did they have a paid informant at counsel table—
The Court: Well, if there is an objection I won't allow that, why they did it.
* * * * *
Mr. Carroll: Sir, we have a representation from the Government in its petition to the Circuit Court of Appeals that, No. 1, Calafatty was an informant and that, No. 2, no information was gleaned from Calafatty relevant to the Rispo-Alamia case, as I understand their representation. I

## I.

The Rispos launch a multi-pronged attack on their convictions, alleging serious violations of their constitutional right to a fair trial and the effective assistance of counsel. While appellants also attack the sufficiency of the evidence to convict, it is the constitutional questions raised that cast the darkest cloud on the fundamental fairness of their trial.

Drawing attention to the fact that both appellants were represented by the same attorney, who had previously represented a Government witness in the same proceeding before trial, the appellants contend that they were denied the effective assistance of counsel. In Walker v. United States, 3 Cir., 422 F.2d 374 (1970), cert. denied 399 U.S. 915, 90 S.Ct. 2219, 26 L.Ed.2d 573 (1970), this court held that although defendants are entitled to the "untrammeled and unimpaired" assistance of counsel for their defense, Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), representation of co-defendants by the same attorney is not tantamount to the denial of effective assistance of counsel guaranteed by the Sixth Amendment. "There must be some showing of a possible conflict of interest or prejudice, however remote, before a reviewing court will find the dual representation constitutionally defective," 422 F.2d at 375. Accord: United States ex rel. Small v. Rundle, 442 F.2d 235 (3d Cir. 1971). The Government contends that

such a showing has not been made here, and that any speculation regarding the failure of both Rispos to take the stand is insufficient to demonstrate prejudice. In fact, appellants concede that "it is impossible to tell from this record why this strategy was followed, nor even for that matter, whether the defenses available to each of these defendants were antagonistic."

More troublesome is appellants' claim that their attorney's cross-examination of his former client, Stanley Cohen, may have been inhibited because he feared breaching an attorney-client relationship with Cohen, and that the trial judge failed to exercise proper judicial control over the trial proceedings by first ascertaining whether the appellants were satisfied with their joint representation. The Government answers that any attorney-client privilege that had existed between Cohen and his former attorney was clearly waived prior to the time of the cross-examination by Cohen's disclosure to the prosecution of his participation in the charged offense. It draws the distinction between the representation here and the simultaneous representation in *Glasser* of co-defendants with competing interests, and concludes that no such simultaneous representation existed here. Finally, it claims that with but one exception,[7] federal courts have not imposed an absolute duty upon the trial judge to advise of the dangers of joint representation, absent the showing of a realistic likelihood of possible conflict of interest.[8]

---

want to probe that to find out whether indeed that is true. The Government has said upon its information—

The Court: All right, I will allow you to show it, but I still say that their motivation is irrelevant. The fact is he was an informant. The fact is—as I say, in the collateral proceeding it is a matter of record in this Court, and I am paraphrasing what was told to me in open court—that what he did he was ordered or directed or asked to do by the FBI. Now, I don't know what you intend to prove. That is why I am asking you to give me an offer of proof.

Mr. Carroll: Well, I purport to be able to prove that the Government has dirty hands in this matter, that they have acted in gross—

\*     \*     \*     \*     \*   "

Transcript of hearing, October 7, 1971, pp. 4–7.

7. Campbell v. United States, 122 U.S.App. D.C. 143, 352 F.2d 359 (1965).

8. Cross-examination of Cohen by Fitzpatrick appears at pp. 59–69 of the trial transcript of February 23, 24, 1971. Mr. Carroll, attorney for defendant Alamia, followed with his cross-examination, which appears at pp. 69–73. Finally,

In Olshen v. McMann, 378 F.2d 993 (2d Cir. 1967), cert. den. 389 U.S. 874, 88 S.Ct. 165, 19 L.Ed.2d 157 (1967) reh. den. 389 U.S. 964, 88 S.Ct. 341, 19 L. Ed.2d 381 (1967), the court stated its disapproval of counsel's undertaking and proceeding with a defense without informing his client and the trial court of facts underlying a possible conflict of interest. The court found it unnecessary to consider the problem presented by an attorney's potential professional reluctance to develop from a witness facts the attorney had obtained as a result of confidential communications, where the record amply demonstrated not only a waiver of attorney-client privilege by the chief prosecution witness but a vigorous cross-examination by appellant's counsel and an exhaustive attack on the witness' credibility. In noting the failure of the trial judge to inquire as to the possibility of prejudice, the court remarked that such inquiry is not necessary where there is no apparent possibility of prejudicial conflict, and where the record is barren of both prejudice and any possible conflict, no judicial intervention is required. In noting that Campbell involved simultaneous representation by the same counsel of co-defendants in a joint trial, Judge Waterman emphasized the difficulty of a trial court to discover a possibility of prejudice where counsel formerly represented one whose interests could be adverse to an accused, absent a disclosure by litigant or counsel. In such a case, "the only available clue that there might be a conflict would be counsel's *conspicuously* inadequate or passive cross-examination of his former client." [9]

Appellants place great reliance on both *Glasser* and *Campbell*. *Glasser* can be distinguished on several grounds. The court there defines "assistance of counsel" guaranteed by the Sixth Amendment as assistance untrammeled and unimpaired by a court order requiring that one lawyer shall simultaneously represent conflicting interests. No such court order was entered here. Furthermore, the trial court in *Glasser* suggested the appointment of counsel for the appellant, and Glasser made an initial objection which he never affirmatively waived. Here the Government raised the shadow of possible conflict in the preliminary hearing prior to trial, and the appellants voiced no objection to the continued representation by Mr. Fitzpatrick.[10] Finally, the court in *Glasser* found that the trial court contributed to the situation which resulted in an impairment of Glasser's rights, inasmuch as "the manner in which the parties accepted the appointment indicates that they thought they were acceding to the wishes of the court."

In *Campbell*, the court was presented with a record which clearly demonstrated prejudice to one of the jointly represented defendants. Although the language in the opinion suggests that the duty of the trial judge to ascertain whether each defendant knows of the risk of joint representation is absolute, the decision itself was made to rest on a definite finding of prejudice to one of the defendants by virtue of his shared representation. While so finding, it is worthy of note that the court in *Campbell* refused to reverse the conviction of the remaining defendant where there

---

Mr. Kafrissen, trial counsel for defendant Calafaty undertook a brief cross-examination, which appears at p. 74.

9. The representation of Cohen was not simultaneous to Fitzpatrick's representation of the Rispos. The record indicates that Fitzpatrick's cross-examination of Cohen was, by no means, passive. The trial judge was also alerted to the possibility of conflict at the pre-trial conference between the court and all parties. The trial judge felt that the occasion was

premature for action until a conflict actually arose, and expressed the confidence that counsel for all defendants would bring any prejudice to the attention of the court.

10. While it is not clear that appellants were present at the preliminary hearing, appellants have not argued that they were thereby foreclosed from raising an objection to Mr. Fitzpatrick's representation thereafter.

was no indication that his defense suffered from sharing an attorney with his co-defendant, although the trial court had not fulfilled its duty to inquire.

■ Appellants' speculative claim that their counsel's cross-examination of Cohen was somehow inhibited is based on their opinion that matters of identification and credibility of witness Cohen were not sufficiently treated on cross-examination by their trial counsel.[11] The standard of effective assistance of counsel to which a defendant is entitled was articulated in Moore v. United States, 432 F.2d 730, 736 (3d Cir. 1970):

> "* * * the standard of adequacy of legal services as in other professions is the exercise of the customary skill and knowledge which normally prevails at the time and place." [12]

■ Although it becomes necessary for this court to voice its disapproval of the conduct of Mr. Fitzpatrick in jointly representing the appellants after having represented defendant Cohen in the instant proceedings,[13] there is nothing in the record before us which indicates a possible conflict of interest between the defenses of John and Robert Rispo. Indeed, appellants concede as much. Their

insistence that this court inject such a conflict into the record cannot be accepted. This court is bound by the record before it, and it fails to support appellants' claim of ineffective assistance of counsel. Therefore, we direct our attention to the points made in the appellants' supplemental brief.

## II.

■ Appellants' supplemental brief in this case was submitted after post-trial disclosure was made by the Government that defendant Calafaty was really a paid Government informant, not guilty of the crimes with which he was charged. The supplemental statement of the question involved is phrased as follows:

> "Where one of four co-defendants charged with conspiracy in a joint trial was a paid government informant before, during and after the trial, which fact was known to the government's trial attorney at all relevant times, but this was not disclosed to counsel for the remaining defendants, are the remaining defendants entitled to a new trial?"

The Rispos strenuously argue that a new trial is mandated by the prosecu-

---

11. The record does not support appellants' claim. See footnote 3 supra. Cohen's cross-examination appears fully at pp. 59–74 of trial transcript of February 23, 24, 1971.

12. Judge Wisdom clearly and capably expressed the standard in MacKenna v. Ellis, 280 F.2d 592, 599 (5th Cir. 1960): "We interpret counsel to mean not errorless counsel, and not counsel judged ineffective by hindsight, but counsel reasonably likely to render *and rendering* reasonably effective assistance." (Emphasis in original)
See also United States v. Rubin, 433 F.2d 442 (5th Cir. 1970), cert. den. 401 U.S. 945, 91 S.Ct. 961, 28 L.Ed.2d 228 (1971).

13. EC 4–5 of Canon 4 of the Code of Professional Responsibility states, "A lawyer should not use information acquired in the course of the representation of a client to the disadvantage of the client. * * * Care should be exercised

by a lawyer to prevent the disclosure of the confidences and secrets of one client to another, and no employment should be accepted that *might* require such disclosure." (Emphasis added.)
The chain of events focused by this appeal has brought Mr. Fitzpatrick before the Committee of Censors of the Philadelphia Bar Association for a hearing inquiring into his professional conduct. Mr. Fitzpatrick has insisted that the matter before the Committee of Censors is essentially a fee dispute between himself and Mr. Cohen, and that "the reason it went to the Bar Association is because I advised Mr. Cohen to take it there." The trial judge apparently disagreed: after Fitzpatrick tendered his explanation of his involvement in the case, Judge Wood by way of aside indicated that Fitzpatrick should be thankful that he [Judge Wood] was not the Board of Censors. Transcript of hearing, January 11, 1971, pp. 3–6.

tor's misconduct in allowing a false state of affairs to exist in the jury's view, thereby participating in a fraud on the defendants as well as the court; by the mere fact that the Government informant intruded into the sanctity of the attorney-client relationship, regardless of whether information obtained by the intrusion was transmitted to the Government; and by being prevented from calling Calafaty as a witness.

At the outset it must be said that a "Fraud upon the court may not be presumed but must be proved." United States v. Perlman, 430 F.2d 22, 25 (7 Cir. 1970), cert. den. 400 U.S. 832, 91 S. Ct. 64, 27 L.Ed.2d 63 (1970). No standard of proof need be elaborated, however, where, as here, the Government itself admits that defendant Calafaty's true identity was known by the prosecuting attorneys, but withheld from the court, co-defendants' counsel and even counsel for the sham defendant.[14] In United States v. American Radiator and Standard Sanitary Corporation, 433 F.2d 174 (3d Cir. 1970) cert. den. 401 U.S. 948, 91 S.Ct. 928, 28 L.Ed.2d 231 (1971), we recognized the high standard of conduct required to be maintained by a prosecutor in the performance of his duties, and that in a proper case his conduct may require a mistrial. That this is a proper case for judicial initiative is apparent from the Government's concession that failure to inform the jury that Calafaty was a paid Government informer undoubtedly left them with a false impression. The attempt by the Government to dismiss its own conduct does not address itself to the very real question of fundamental fairness and can be reduced to a statement of a harmless error test: The "error" here has not been shown to be prejudicial, thus requiring

---

14. "BY MR. CARROLL: (trial counsel for Alamia):

Q. Mr. Kafrissen, you represented the defendant William Calafatty, is that correct?

A. Yes, I did.

Q. Was that pursuant to court appointment?

A. Yes, sir, it was.

Q. Did you receive your court appointment in the normal course of business?

A. Yes, I did. I was appointed by Judge Troutman.

Q. Now, when did you first become aware that Mr. Calafatty was an informant?

A. Somewhere after the beginning of the trial. I could not say exactly when. I would say somewhere along about the middle. It was a very short trial, but it was after the trial had begun.

Q. Prior to that time had you yourself participated in conferences with other defense counsel in the case?

A. Yes, I had.

Q. And had you conferred in turn with Mr. Calafatty?

A. Yes, I had.

Q. Did you reveal the fact that you knew that Mr. Calafatty was an informant to other defense counsel in the case?

A. When?

Q. At any time?

A. No. Well, once the disclosure was made, but not prior to that.

Q. I am talking about prior to the time the Government made its disclosure.

A. No, no, not to any other defense counsel.

Q. During the course of the trial before the time that you found—incidentally, how did you find out that Mr. Calafatty was an informant?

A. Mr. Calafatty told me.

Q. Prior to the time that Calafaty told you that he was an informant, did you regard it as a conventional criminal case in defending Mr. Calafatty?

A. Yes. I am not so sure that I know what "conventional" means, but I assume that you mean in the ordinary course of criminal cases, yes, sir.

MR. CARROLL: Nothing further with the witness, Your Honor."

On cross-examination, Kafrissen testified that, at first, he found Calafaty's disclosure both shocking and unbelievable. He admittedly sought to verify Calafaty's identity with an agent of the FBI and with Richard T. Spriggs, the Government trial attorney in the case. Kafrissen was told that " 'Yes, it was true,' but that was the extent of any communication." Transcript of hearing, October 7, 1971, pp. 19–22.

reversal.[15] The problem with applying such a test, whether it be designated as a harmless error, untainted evidence or overwhelming evidence test, is that in the context of a case such as this, there is no tainted evidence which may be segregated, and the effect of some errors which affect the entire trial process cannot be intelligently gauged by applying such a test. The nature of the rule limits its operation to the assessment of errors which bear on particular evidence. An error which affects the entire trial machinery necessarily raises doubts whether all relevant evidence is in the record and whether all evidence in the record is what it purports to be. Although some commentators have called for a rule of automatic reversal in such cases,[16] state harmless-error rules, and the new federal standard as enunciated in *Chapman*,[17] and in Harrington v. California, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969), continue to be applied by the courts in those cases where a rule of automatic reversal has not otherwise been established.[18] In such instances, appellate review is generally made to focus on the effect of the breach on the conviction itself,[19] and a "harmless error" test becomes an important instrument in weighing the degree of prejudice suffered by a defendant as a result of the official misconduct. The results are usually expressed in terms of due process.

In Lisenba v. California, 314 U.S. 219, 62 S.Ct. 280, 86 L.Ed. 166 (1941), where the court was faced with the use at trial of a coerced confession, Mr. Justice Roberts, in writing for the majority, considered the denial of due process in a criminal trial to be "the failure to observe that fundamental fairness essential to the very concept of justice. In order to declare a denial of it we must find that the absence of that fairness fatally infected the trial; the acts complained of must be of such quality as necessarily prevent a fair trial."

Several years later, in In re Murchinson, 349 U.S. 133, 75 S.Ct. 623, 99 L.Ed. 942 (1955), Mr. Justice Black declared in a majority opinion that "a fair trial in a fair tribunal is a basic requirement of due process. Fairness of course requires an absence of actual bias in the trial of cases. But our system of law has always endeavored to prevent even the probability of unfairness," and that "to perform its high function in the best way 'justice must satisfy the appearance of justice'" citing Offutt v. United States, 348 U.S. 11, 14, 75 S.Ct. 11, 13, 99 L.Ed. 11 (1954).

In *Lisenba*, Mr. Justice Roberts cited examples of due process violations. Each occupies a separate chapter in the history of official abuse of power. In *Murchinson*, the question was whether a contempt proceeding complied with the due process requirement of an impartial

---

15. The Supreme Court in Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967) stated that "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt."

16. For a discussion of the harmless error test and its limited utility, see "Harmless Constitutional Error: A Reappraisal," Harvard Law Review, Volume 83, No. 4, February 1970.

17. See footnote 15, supra. Cf. Schneble v. State of Florida, 405 U.S. 427, 92 S.Ct. 1056, 31 L.Ed.2d 340.

18. In *Chapman, supra*, the Supreme Court named three constitutional rights to which a rule of automatic reversal would apply, citing Payne v. Arkansas, 356 U.

S. 560, 78 S.Ct. 844, 2 L.Ed.2d 975 (1958) (coerced confessions); Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963) (right to counsel); Tumey v. Ohio, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927) (impartial judge).

19. Cf. Jackson v. Wainwright, 390 F.2d 288 (5th Cir. 1968) where a "harmless-error" rule was applied to a situation in which the district attorney knowingly concealed the exculpatory testimony of an eye witness to a crime. If the district attorney had knowingly used perjured testimony, there would have been grounds for an automatic reversal. See Miller v. Pate, 386 U.S. 1, 87 S.Ct. 785, 17 L.Ed.2d 690 (1967); Napue v. Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1958).

tribunal where the same judge presiding at the contempt hearing had also served as the "one man grand jury" out of which the contempt charges arose. Against such a background, Mr. Justice Black's concern for the appearance of justice comes sharply in focus.

To provide a conceptual framework for the constitutional requirement of due process of law requires the impossible task of exploring the outer limits of judicial imagination, matching situation against circumstance in an endless combination of factual possibilities. Mr. Justice Frankfurter recognized the dilemma in Rochin v. California, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952), where he expressed it as follows:

> "Due process of law, as a historic and generative principle, precludes defining, and thereby confining, these standards of conduct more precisely than to say that convictions cannot be brought about by methods that offend 'a sense of justice' ".[20]

The concept of due process is thus seen as a bi-polarity with certain negative indications on the one hand and a more positive "sense of justice" on the other.

The Government concedes that a false impression was created in the jury's view by trying the sham defendant Calafaty, but argues that this impression was only indirectly related to the case against the appellants. It counsels the court not to extend the scope of Black v. United States, 385 U.S. 26, 87 S.Ct. 190, 17 L.Ed.2d 26 (1966) to the situation here, where the mere presence of Calafaty in the defense camp did not result in any demonstrable prejudice. In support of this conclusion the Government points out that Calafaty's participation in the criminal transaction was separate and apart from that of the Rispos, and that Calafaty was not used as a Government witness to support the charges against them. Appellants counter this argument by contending that a duty of disclosure

exists whenever evidence has material relevance to the issue of guilt or punishment, and the fact that one of four defendants is not guilty of the crime with which he is charged would tend to negate the guilt of the accused or mitigate the degree of the offense and thus should have been made known by the Government. On the issue of intrusion, appellants urge that the mere fact of intrusion by the Government informant into the sanctity of the attorney-client relationship is enough to warrant reversal of the conviction.

The Government makes much of the distinction it finds between this case and other cases cited by appellants where new trials were granted because of a "gross" intrusion into the attorney-client relationship.

We now examine *Black* and later cases to determine whether Calafaty's presence can be characterized as an intrusion.

A hard and fast rule was laid down by the Circuit Court of Appeals for the District of Columbia in Caldwell v. United States, 92 U.S.App.D.C. 355, 205 F.2d 879 (1953), where a conviction was vacated and a new trial granted on the basis of an intrusion into an attorney-client relationship, without a showing of actual prejudice. However, the court seems to have assumed that the mere fact of the intrusion, without more, tainted the conviction, when it employs language making such misconduct prejudicial *per se*.

However, in United States v. Zarzour, 432 F.2d 1 (1970), the Fifth Circuit was unwilling to reverse a conviction where a private investigator assisted in the preparation of the defendant's case while he was employed as a paid informant for the F.B.I. without a further showing of resulting prejudice. The opinion distinguishes *Caldwell* and *Black* as cases which "dealt with government

---

**20.** Justice Black took occasion to criticize the majority opinion in *Rochin* for what he regarded as an objectionable subjective interpretation of the requirements of due process in terms of conduct that "shocks the conscience," offends "a sense of justice" or runs counter to the "decencies of civilized conduct."

intrusion of the grossest kind," where the wiretap or informant placed in the legal camp of the defense did not, in and of itself, vitiate the conviction without a further showing that the Government's evidence was "tainted."

In *Black*, the court held that a tax evasion conviction should be reversed and a new trial granted to afford petitioner the opportunity to protect himself from use of evidence that might be inadmissible when, pending application for rehearing of denial of certiorari, the Solicitor General informed the court that federal agents in connection with other matters had monitored conversations between petitioner and his counsel in a hotel suite and that the contents of the recorded conversation had been incorporated in memoranda used by the prosecuting attorneys.

In O'Brien v. United States, 386 U.S. 345, 87 S.Ct. 1158, 18 L.Ed.2d 94 (1967), relying on its decision in *Black*, the court reversed and remanded a conviction where it was informed by the Solicitor General that a conversation in which O'Brien participated, occurring after the indictment and concerning his forthcoming trial, was overheard by monitoring agents and summarized in their logs. The conversation was not mentioned in any F.B.I. report nor were its contents communicated to attorneys for the Department of Justice, including those who prosecuted the case.

Any apparent conflict between these cases and Granello et al. v. United States, 386 U.S. 1019, 87 S.Ct. 1367, 18 L.Ed.2d 458 (1966), can be resolved on factual grounds. In *Granello*, petitioners alleged an intrusion where papers were seized from a lawyer's premises in Pennsylvania by law enforcement officers, and where a commercial establishment located in Florida in which petitioner Levine had a part interest was under electronic surveillance by the F.B.I. and certain conversations in which Levine participated were overheard. Certiorari was denied, Justices Douglas, Fortas and Chief Justice Warren dissenting. In the first instance, it appears from Justice Douglas' dissent that it was unclear whether the petitioners were clients of the attorney from whose office the papers were allegedly seized. With regard to the electronic surveillance, the Solicitor General represented that the surveillance had no relation to the tax prosecution then before the court on the petition, but originated in connection with a Florida criminal prosecution. Nothing was overheard which had anything to do with the main case, and neither the IRS nor prosecuting counsel was apprised of the existence of the surveillance.[21]

Whether or not the intrusion by the Government here can be characterized as "gross" is a matter of degree, and this court will not be bound by such considerations where the probability of unfairness due to the Government's misconduct is incapable of realistic delineation. Furthermore, we do not find the Government's protest that no intrusion occurred to be convincing, where it concedes that Calafaty was a Government informer both before and during trial.[22]

---

21. Mr. Justice Fortas argued in his dissent that the case should be remanded for a hearing in the District Court with respect to the electronic surveillance. At page 1021, 87 S.Ct. at page 1369, he explains why such a hearing is important: "An appraisal of the material and the circumstances by defense counsel may adduce facts affecting the weight to be given to the unlawful operation which would never occur to the prosecutor. The prosecutorial eye is, after all, apt to yield an out-of-focus picture, as is the eye of the defense. But in our system we insist upon the perspective developed by both."

22. The Government notes in its supplemental brief that nothing developed at the hearing on Alamia's motion suggests that Calafaty took part in conferences relating to the trial, although Calafaty's attorney participated in pretrial and trial conferences and strategy sessions, and discussed those strategy sessions with him. The possibility of prejudice implicit in such a situation is unlimited, especially where counsel for Calafaty, who was

Any similarity between the factual picture here and cases such as *Zarzour* loses its significance by the additional fact that the deception practiced here continued through the entire trial, with the result that the Government foisted the deception upon the trial court. Insofar as appellants' claim of suppression of evidence presupposes a duty to disclose arising out of the initial illegality, it does not address itself to the primary issue of the effect of that illegality on the availability of a fair trial.[22A] By the same token, the attempt by the Government to place its activity outside of the scope of the rule announced in *Black* and *O'Brien*, in placing the burden of showing prejudice on the appellants, requires this court to construct a standard of due process of mathematical precision by which the presumption of fairness adhering in a duly constituted trial can be rebutted only by evidence of "gross" misconduct. We reject this thesis. We need only draw attention to the rule laid down in *Chapman*, that a constitutional error may only be deemed harmless when it is shown harmless beyond a reasonable doubt. While it is not necessary to lay down a rigid standard of prejudice *per se*, it is well to keep in mind the view expressed in *Glasser*, that "the right to have the assistance of counsel is too fundamental and absolute to allow courts to indulge in nice calculations as to the amount of prejudice arising from its denial." 315 U.S. at 76, 62 S.Ct. at 467. In *Black*, the prosecuting attorneys unwittingly referred to notes which contained information regarding monitored conversations. In *O'Brien*, the overheard conversations were neither included in F.B.I. reports nor related to the Department of Justice. In both cases, the danger posed by such intrusions was considered to be real enough to require reversal and new trial. In both *Black* and *O'Brien*, Justices Harlan and Stewart dissented from what they regarded as a policy of automatic reversal in cases of Governmental intrusion, no matter how slight, and felt that a new trial was not an appropriate vehicle for "sorting out the eavesdropping issue * * * until it is determined that such occurrence vitiated the original conviction." We express no opinion as to the practical effect of the majority holding in those cases on the broader area of electronic eavesdropping. However, the concern expressed by the court in those cases regarding the very real likelihood of prejudice, and the need to eliminate such likelihood from the trial process in order to satisfy the requirements of due process, convinces this court that a new trial is required here. It should be noted that the intrusion in the above cases was once removed from that which occurred in this case. Furthermore, we have the additional ingredient of knowledge and acquiescence in the deception by the prosecuting attorney, who argued Calafaty's guilt to the jury in summation and his intent to prove that guilt in his opening remarks.[23] Such conduct is not consistent with the concepts of fairness implicit in the requirement of due process. The ends of justice are not served by such deception, and even the appearance of justice becomes unattainable. Cf. United States v. Lusterino, 450 F.2d 572 (2d Cir. 1971).

We are not unmindful that informers have become indispensable sources of information in police work. However, the factual tableau presented here is shocking. The charges in the indictment

court appointed, was unaware of his client's true identity. To point out that counsel was not working for the Government, as it does in its brief, is unrealistic and rather facile. At any rate, the Government argues that even if Calafaty did participate in defense conferences, such participation does not automatically require reversal.

22A. We note that the trial of Calafaty with appellants prevented them from calling him as a witness.

23. The jury apparently found the prosecution persuasive: Calafaty was found guilty of both the substantive and conspiracy counts. Only one other defendant, appellant John Rispo, shared the same fate.

against Calafaty; the use of a court appointed attorney for him; the opening remarks and summation by the Government prosecutor pointing the finger of guilt at Calafaty; the participation of this "defendant" in the trial; the conferences of his attorney with other defense counsel; the Government's admission that "in this rather exceptional circumstance * * * there is no longer need to conceal what the situation was": the sum total is a preconceived and intentional plan to disregard legal standards and precedents in criminal prosecutions. Such legerdemain cannot be countenanced by this court.

Ironically, as previously noted, Calafaty the informer and sham defendant, was found guilty of both counts in the indictment; whereas appellant Robert Rispo was found guilty of conspiracy but not guilty of the substantive offense.

The basic concept of due process is fair play. The test of our system of legal jurisprudence should be measured by the interest we take in safeguarding the fundamental rights of an accused. A defendant is entitled to a fair determination of his guilt. Fair trials insure our concern with due process and contribute to what we believe is the proper administration of criminal justice. It is only in this way that we prevent the undermining and mockery of justice. "The most fundamental of a reviewing court's duties is to see to it both that the end result in a case is just and correct and that the means utilized are fair and proper. Such is the essence of due process of law." [24]

We have reviewed the entire record and conclude that the "means utilized" to obtain convictions against appellants were unfair and improper.

For the foregoing reasons we will reverse the judgments of convictions in appeals Nos. 71–1413 and 71–1414, and remand the cases to the district court for a new trial.

24. Lowenstein v. Newark Board of Education, 33 N.J. 277, 290, 163 A.2d 156, 162 (1960).