**UNITED STATES of America**

v.

**Ralph NATALE, Vincent Fardella, Malcolm Block, Francis X. McDonnell, Philip Schwartz.**

Crim. No. 78–226.

United States District Court,
E. D. Pennsylvania.

Dec. 28, 1979.

Joel M. Friedman, Louis R. Pichini, Molly Houghton Colburn, Dept. of Justice, Strike Force, Philadelphia, Pa., for plaintiff.

Robert Simone, Philadelphia, Pa., for Natale and McDonnell.

Joel Harvey Slomsky, Edward Reif, Philadelphia, Pa., for Fardella.

Francis J. Hartman, Mount Holly, N. J., for Block.

F. Emmett Fitzpatrick, Philadelphia, Pa., for McDonnell.

C. Oliver Burt, III, Philadelphia, Pa., for Schwartz.

## OPINION AND ORDER

VanARTSDALEN, District Judge.

The defendants were convicted of various federal offenses arising out of the destruction by an explosive fire of a building identified as Mr. Living Room, located in Marlton, New Jersey, on March 1, 1977. The convictions were all affirmed on appeal, but the case was remanded to the district court "for an evidentiary hearing" on the issue, first raised in the Court of Appeals, of whether the government had planted an informer in the defense camp who intruded into defense strategy and recorded conver-

sations with defendants relative to this case.

The mandated evidentiary hearing has been held, requiring eight (8) trial days of testimony.[1] I conclude, on the basis of the record, that there was no violation of any of the defendants' rights, and that none of them is entitled to any relief from the conviction and judgment of sentence.

## FINDINGS OF FACT

1. On March 1, 1977, a commercial building located in Marlton, New Jersey, known as "Mr. Living Room," was destroyed in a violent conflagration.

2. Following an extensive investigation, the present defendants and Samuel Kerns, the owner of the building, were jointly indicted by a federal grand jury on July 10, 1978 for alleged offenses arising out of the fire. In substance, the indictment charged the defendants with an interstate conspiracy to destroy the building for the insurance proceeds by arson and explosion (napalm). The charges were based on violations of the federal "Travel Act," 18 U.S.C. § 1952; "Racketeer Influenced and Corrupt Organizations Act" (RICO), 18 U.S.C. § 1962(c), conspiracy statute, 18 U.S.C. § 371, and related statutes.

3. Samuel Kerns pleaded guilty. He did not testify at the trial of the other defendants. The remaining five defendants were tried jointly, and all were convicted of certain of the counts. The trial commenced on November 1, 1978 and concluded with the verdict on November 21, 1978. Sentence was scheduled for January 3, 1979, but continued, at the government's request, until January 12, 1979.

4. Albert Augustine, a named, but unindicted co-conspirator, was one of the government's principal witnesses at the trial. None of the defendants testified at the trial, nor did Charles Allen, the informer whom defendants contend "intruded into the defense camp."

1. The transcript of the hearing contains approximately 1,660 pages.

5. Around July, 1976, Charles Allen became a "confidential informant" to Special Agent Henry Handy of the Philadelphia Office of the Federal Bureau of Investigation (FBI). He continued in that role until about September 19, 1978.

6. Agents of the FBI routinely utilize confidential informants in various investigations. The FBI defines a confidential informant as a person who provides confidential information to the FBI on a continuing basis, but without expectation of having his or her identity revealed and without expectation of being required to testify in court concerning the confidential information provided. Customarily, a confidential informant has direct contact and communication with only a single FBI agent to whom the informant is specially assigned. The informant's name and identity and status as an informant is ordinarily known only to that agent. The informant is assigned a number, and all FBI reports and records identify the informant only by the assigned number. A master list of confidential informants, their assigned numbers, names and identities is maintained by the FBI, but the list is available for inspection by FBI personnel only on a "need to know" basis. Thus the name and identity of a confidential informant is maintained in secrecy and strict confidentiality by the FBI.

7. At the time that Mr. Allen became a confidential informant, Special Agent Handy instructed him not to become involved in the defense strategy of any person in any matter that came to his attention. Such instruction was at that time routinely and expressly given to all confidential informants of the FBI who were reporting to FBI agents within the geographical area of the third judicial circuit. The instruction was instituted as a result of the decision of *United States v. Rispo*, 460 F.2d 965 (3d Cir. 1972).

8. Around November of 1977, Charles Allen reported to Special Agent Handy that he, Allen, had been "offered a piece of Mr. Living Room." This information was received about nine months after the fire. It does not appear that anything was done with this information other than to make and place report of it in a routine file. The federal agents who were investigating the fire were not advised of this information prior to the return of the indictment.

9. Through information obtained from Albert Augustine, the federal agents who were investigating the fire were advised that Charles Allen was present during a conference among certain of the co-conspirators at the law office of co-conspirator Malcolm Block. The government attorneys in charge of the Mr. Living Room fire investigation were of the opinion that there was insufficient evidence of involvement by Charles Allen to seek his indictment as a co-conspirator, and they were not then aware that Mr. Allen was an FBI informant and were not then informed of Mr. Allen's statement to Special Agent Handy.

10. Around July of 1978, Charles Allen was arrested and charged with violation of certain drug laws. Induced, at least in part, by that arrest, he revealed to law enforcement investigators outside of the FBI that he was an FBI informant. Having revealed his identity to another agency, under FBI procedures, he was no longer considered to be an FBI informant.

11. Around the middle of September, 1978, Charles Allen agreed to become a "cooperating witness" and to provide testimony before grand juries and trial juries and to assist in ongoing investigations being conducted by the FBI and other federal law enforcement agencies in a wide range of organized criminal activities as to which he claimed extensive personal knowledge by reason of past involvement in such activities.

12. The Philadelphia Office of the FBI is organized into separate squads of special agents, each of whom works under a squad supervisor. The work of each squad remains secret and confidential within that squad, although in complicated investigations there may be cooperation between and among squads having overlapping areas of responsibility, and there may be exchange of confidential information on a "need to know" basis. All squads of the Philadel-

phia FBI headquarters have their office space and desks in a single large room in the Federal Building at 6th and Arch Streets.

13. Special Agent James Maher of the FBI, who had been assigned to investigate thefts from interstate shipments, conspiracies to commit murder, narcotics laws violations and loansharking activities, was placed in charge of coordinating Mr. Allen's activities as to ongoing investigations at the time Mr. Allen agreed to become a cooperating witness. Special Agent Maher's first contact with Mr. Allen was about September 19, 1978. Other FBI agents assigned to work with Agent Maher in directing Mr. Allen and working on various investigations as to which Mr. Allen would provide assistance and information were Special Agents Henry Handy, William McMullen and John Tamm. Agents Handy and McMullen were in Squad 4 under the supervision of Special Agent George Sherwood, and Agents Maher and Tamm were in Squad 1 under the supervision of Special Agent William Perry. In addition to these FBI agents, also assisting in various investigations involving Charles Allen, were Special Agents William Herbert and Harold Perlick of the Bureau of Alcohol, Tobacco and Firearms, Special Agent Bohden Mizak of the Drug Enforcement Agency and Philadelphia Police Officer William Hausman, specially assigned to the Drug Enforcement Agency.

14. The attorneys and government investigating agents who made up the team that investigated, prosecuted and tried the defendants for the Mr. Living Room arson case were the following: Special Attorneys from the Department of Justice "Strike Force" Louis Pichini and Molly Colburn; FBI Special Agent Paul Nolan, the supervisor of Squad 6 identified as the "business crimes squad"; FBI Special Agent David Seel, the "case agent" in charge and also a member of Squad 6; Special Agent James Donegan of the Secret Service; Special Agent William Herndon of the Camden, New Jersey office of the Bureau of Alcohol, Tobacco and Firearms. This group of attorneys and law enforcement officials is hereafter collectively referred to as the "prosecution team."

15. After the indictment was returned against the defendants, from July 10, 1978 through to the date of sentencing, January 12, 1979, no member of the prosecution team received any significant investigative lead or additional investigative information concerning the Mr. Living Room arson from any source whatsoever.

16. Sometime after the return of the indictment, but prior to September 19, 1978, Henry Handy obtained information from his then confidential informant, Charles Allen, concerning certain activities of several of the defendants, which information was reduced to writing and delivered to Special Agent Seel of the prosecution team. That information is contained in Exhibits G–5 and G–5A. The substance of the information insofar as it relates to the Mr. Living Room arson case is as follows:

a. On July 14, 1978, Ralph Natale left for Palm Springs, California, because his attorney was able to have the travel restrictions modified. (This information was a matter of public record, and available to, if not actually known by, the prosecution team's attorneys.).

b. Vincent Fardella left Philadelphia and might be in Florida. This again was information known or readily available to the prosecution team.

c. Francis McDonnell then thought that Samuel Kerns or Joseph Ranoia "may fold under pressure and testify for the government" and he believed that Leonard Kerns, Sam Kerns' son, and Joseph Ranoia had been immunized by the government. The basis for Mr. Allen's conclusions as to what Mr. McDonnell thought or believed is not apparent. Samuel Kerns entered a plea of guilty, but did not testify at the trial. Joseph Ranoia did testify.

d. Ralph Natale "had okayed a contract for $20,000 for a hit on Malcolm Block," but such a "contract" would have to be "cleared" with Angelo Bruno. The basis of this information is not disclosed. The balance of the information in Exhib-

its G–5 and G–5A has no relation to the Mr. Living Room arson.

17. With the exception of the information contained in Exhibits G–5 and·G–5A, no member of the prosecution team ever received any information concerning the Mr. Living Room fire or any of the persons involved in the arson either directly or indirectly from Charles Allen until after the defendants were sentenced. No information received from Charles Allen or by reason of anything said or done by him, either directly or indirectly, resulted in or was used by the government in the prosecution of defendants at any stage of the proceedings.

18. All of the FBI and other investigating officials who had contact with Charles Allen while he was a confidential informant and later a cooperating witness testified at the hearing. None ever gave to any member of the prosecution team any information that was learned or obtained, either directly or indirectly, from Charles Allen, with the exception of contents of Exhibits G–5 and G–5A revealed to David Seel before Charles Allen became a cooperating witness. All members of the prosecution team testified at the hearing. No member of the prosecution team ever received any information or evidence either directly or indirectly from Charles Allen, with the exception of Exhibits G–5 and G–5A, concerning the Mr. Living Room arson or any of the defendants charged in connection with the arson until after the defendants were sentenced. No information or evidence derived by the government from anything Mr. Allen said or did, directly or indirectly, was utilized in any stage of the prosecution against any of the defendants.

19. None of the FBI agents who were assigned to work with or supervise the activities of Charles Allen ever were members of the squad supervised by Special Agent Paul Nolan, the FBI supervising agent in charge of the Mr. Living Room arson investigation, nor were any members of the prosecution team.

20. About two or three weeks after the destruction by fire of the Mr. Living Room building, Special Attorney Louis Pichini was consulted by investigating law enforcement officials. From that time (around the latter part of March, 1977) forward, Mr. Pichini was the attorney from the Department of Justice directly in charge and responsible for the investigation of the fire and the prosecution of the defendants. Joel Friedman was, throughout this period, the attorney in charge of the Philadelphia Office of the Department of Justice's Strike Force. Mr. Friedman took no active part in the prosecution of the case, beyond advising and consulting with Mr. Pichini and routinely signing pleadings as the attorney in charge. Around October 6, 1978, prior to Mr. Allen recording any conversations with Mr. Natale or Mr. McDonnell, Mr. Friedman removed himself completely from the case, as hereafter detailed.

21. At or about the time Mr. Allen agreed to become a cooperating witness, approximately September 19, 1978, a meeting of various law enforcement officials was held for the purpose of determining how best to utilize Mr. Allen in ongoing investigations. Mr. Friedman attended the meeting. At Mr. Friedman's direction, Mr. Pichini was also there. At that meeting there was no discussion concerning Mr. Allen's knowledge of or possible involvement in the Mr. Living Room arson case. There was, however, discussion as to Mr. Allen continuing to maintain his existing pattern of frequent contacts and association with Mr. Natale and Mr. McDonnell. There was also discussion of the possibility and advisability of recording conversations between Mr. Allen and Mr. Natale.

22. Another meeting among the law enforcement officials was held in late September, 1978. Again Mr. Friedman attended, as did Mr. Pichini at Mr. Friedman's direction. At that meeting both Mr. Friedman and Mr. Pichini stressed that nothing should be done that would in any way jeopardize or interfere with the prosecution and trial of the defendants charged with the arson on the pending indictment.

23. In early October, 1978, a decision was made by investigating authorities, ap-

parently with the concurrence of the Department of Justice in Washington, D. C., that Mr. Allen should attempt to record conversations with Ralph Natale. Mr. Pichini took no part in this decision. He was simply advised by Mr. Friedman that such a decision had been made.

24. At the time Mr. Friedman advised Mr. Pichini that attempts would be made to record conversations of Ralph Natale, Mr. Friedman advised Mr. Pichini that he, Mr. Friedman, was removing himself completely from the Mr. Living Room case, and that thenceforth Mr. Pichini would have to make all decisions about the case without consulting with Mr. Friedman or any other attorney in the Philadelphia Strike Force Office, except for Mr. Pichini's co-attorney, Molly Colburn. Mr. Pichini was further advised that if anything should come up that he thought he could not handle or decide without Department of Justice approval, he should contact either Philip Fox or Gerald McGuire, attorneys with the Department of Justice in Washington, D. C. Thereafter Mr. Friedman took no active part in the prosecution. He did not supervise, advise or consult with Mr. Pichini or any other member of the prosecution team concerning the case until after the defendants were sentenced. He did, however, continue to read and sign various pleadings filed in his capacity as head of the Philadelphia Strike Force, but this was done as a routine matter without any changes in the pleadings and without any consultation or suggestion by him to anyone regarding the contents or form of the pleadings.

25. After the court had set sentencing for January 3, 1979, Mr. Friedman, without the prior knowledge of or consultation with any member of the prosecution team, sought an extension of the date set for sentencing, anticipating that certain investigative information would soon become public knowledge and be available and of significance to the trial judge in imposing sentence. The date of sentencing was rescheduled upon Mr. Friedman's application to January 12, 1979.

26. Although Mr. Pichini was made aware during the two meetings he attended in September that Mr. Allen would continue to have contact and association with Mr. Natale, and was also made aware at a later date that a decision had been made to attempt to obtain recordings of conversations between Mr. Allen and Mr. Natale, Mr. Pichini did not in fact know what contacts, recordings, attempted recordings, associations or conversations, if any, occurred between Mr. Allen, Mr. Natale and Mr. McDonnell from the time of the return of the indictment until after the date of sentencing.

27. When Mr. Allen first became a cooperating witness around September 19, 1978, he was instructed not to contact either Mr. Natale or Mr. McDonnell because of the pending indictment in the Mr. Living Room arson conspiracy. Mr. Allen reported to the FBI information that led to the suspicion of an impending gang war in which both Mr. Natale and Mr. McDonnell might be either involved or privy to relevant information, especially concerning weapons and silencers for firearms that were being sought. Mr. Allen's information was to the effect that Mr. Natale was continuing to engage in extensive criminal activities. The FBI and other investigating officials thereupon considered it important that Mr. Allen continue his normal frequent contacts with Mr. Natale to (a) report on possible ongoing criminal activities, (b) avoid suspicion of his status as a cooperating witness which would terminate his usefulness in an undercover capacity and involve personal danger and risk to Mr. Allen.

28. Mr. Allen was, therefore, advised to continue his customary contacts with Mr. Natale and Mr. McDonnell and report on their activities in ongoing criminal activities. He was, however, instructed not to discuss with them anyone's involvement in the Mr. Living Room arson case or any of the facts of that case or any defense strategy. Mr. Allen was instructed to avoid, insofar as possible, without arousing suspicion as to his status as a cooperating witness, all discussion whatsoever about the Mr. Living Room case, to walk away from such conver-

sations, if practical, or to change the subject of the conversation, if possible. Mr. Allen was further advised that if, despite the instructions, he became aware of any information concerning the Mr. Living Room case or any defense strategy he was not to relay this information to the investigating officers.

29. All of the investigating officers were advised that any and all information received from Mr. Allen was to be "quarantined" from all members of the prosecution team. These instructions were completely carried out.

30. Before Mr. Allen started wearing a body recorder to record conversations with Mr. Natale, he was again instructed not to become involved in any defense strategy discussions, to avoid the subject of the arson, and if it came up, to remove himself from such conversations, if possible, and if possible without detection, to deactivate the recording device. The agents were directed to ask Mr. Allen, upon returning from any conversation that was recorded, whether any conversation about the Mr. Living Room case occurred and/or was recorded, and if so, to report such fact to Mr. Friedman, without asking Mr. Allen the substance of the conversation.

31. The first body-recording taped conversation between Mr. Allen and Mr. Natale occurred on October 8, 1978.

32. On October 20, 1978, the government obtained from Judge Broderick of this court an order authorizing Mr. Allen to continue to record conversations with Ralph Natale and/or Francis McDonnell and not to disclose the fact of such recordings to the parties whose voices were recorded. These proceedings are docketed in this court under Miscellaneous Docket No. 78–740. That court docket, which is no longer impounded, contains all of the conversations recorded by Mr. Allen of Mr. Natale and Mr. McDonnell, including those made by a body recorder and those consensually recorded over Mr. Allen's telephone. The recordings disclose information on a wide range of ongoing large-scale criminal activities. There are certain references in the recordings con-

cerning the Mr. Living Room case and, in particular, discussions concerning co-defendants in the case with references to the possibility of some of the co-defendants being murdered by other co-defendants.

33. No member of the prosecution team was advised either directly or indirectly of the contents of any of the recorded conversations until after the records in Miscellaneous No. 78–740 were unimpounded on February 8, 1979, which was subsequent to the date of sentencing.

34. In addition to the taped conversations, Mr. Allen reported to the investigating agents in detail his contacts with Mr. Natale and Mr. McDonnell and the substance of conversations on those occasions when no recording was made. None of that information, either directly or indirectly, ever came into the knowledge or possession of any member of the prosecution team until after the date of sentencing.

35. At no time did Charles Allen ever talk with any of the attorneys representing the defendants in the Mr. Living Room arson case and at no time did he ever attend any meeting between or among any of the defendants and any of defendants' attorneys, or overhear or intercept any conversations or communications between any of the defendants and any of the defendants' attorneys in reference to the Mr. Living Room arson case.

36. Charles Allen did not advise or counsel any defendant in the Mr. Living Room arson case in any matter concerning defense of the charges, nor did he attempt to do so. Nothing that Mr. Allen ever said or did influenced in any way any of the defendants in the Mr. Living Room arson case in respect to any trial strategy or tactics.

37. Charles Allen did not advise Francis McDonnell not to take the witness stand in his own defense, and nothing that Charles Allen said or did, before or during the trial, in any way induced or influenced Mr. McDonnell in his decision not to testify.

38. The government attorneys made no factual misrepresentation to the trial judge concerning whether there were informants

and/or taped conversations that violated the rule of *United States v. Rispo*, 460 F.2d 965 (3d Cir. 1972), or would require disclosure under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

39. No confidential informant information from any source was received by the Philadelphia Office of the Secret Service, or the Philadelphia Office of the Bureau of Alcohol, Tobacco and Firearms concerning the Mr. Living Room arson case from July 10, 1978 through January 12, 1979.

40. The FBI received certain information concerning the Mr. Living Room arson case on two separate occasions between July 10, 1978 and January 12, 1979 that was derived from a confidential informant source or sources other than Charles Allen. The first information was received around October 10, 1978, but this information was never divulged either directly or indirectly to any member of the prosecution team on or prior to January 12, 1979. The information has been produced to the trial judge pursuant to order of December 4, 1979 and inspected in camera. It does not in any respect involve legitimate trial strategy or tactics, or disclose any attorney-client confidences, and was in no way relevant to any issue presented at the trial. The information was not exculpatory, nor would it have been useful to the defense. If the information was correct, it was by its nature already known to the defense. It does not involve *Brady* material.

41. The second piece of information derived from a confidential source other than Charles Allen was received subsequent to the date that the jury rendered its verdict, and therefore did not affect the outcome of the trial. The material was passed on to Special Agent Seel of the prosecution team. The information was not utilized in any post-trial motion or application, nor for any purpose in the sentencing process. It did not involve any legitimate defense strategy or tactics, or disclose any attorney-client confidences, and was in no way relevant to any issue presented at trial. The information was not exculpatory, nor would it have been useful to the defense. If the informa-

tion was correct, it was already known to the defense. It does not involve *Brady* material. It has been examined in camera.

## DISCUSSION

The defendants contend, in substance, that the government "planted an informer in the defense camp who intruded into defense strategy and recorded conversations with defendants" relative to the Mr. Living Room arson trial, thereby violating defendants' rights to a fair trial.

Initially, it must be noted that at no time did Charles Allen, the informer, ever have any contact with any attorney representing any of the defendants; he never spoke with or overheard or read any statements by any defense attorney. He never attended any meetings between any attorneys and any of the defendants.

In all of the reported cases involving an alleged intrusion into the defense camp, so far as I am aware, there was a direct involvement of the informer in defense meetings between a defendant and his attorney, or an overhearing or interception of some communication between a defendant and defendant's attorney concerning the defense of the case. In this case there was no intrusion of any kind into any communication between any defendant and defense counsel. It is clear that defendants are seeking a far broader restriction upon governmental investigative activities than any court has heretofore imposed. The logical import of the defendants' contentions in this case would be that once an indictment is returned, all contact by a government informant with the accused must immediately cease, even where the informant is obtaining valuable information concerning ongoing investigations of continuing criminal activities by the accused totally unrelated to the charges upon which the indictment is based.

In *United States v. Rispo*, 460 F.2d 965 (3d Cir. 1972), a paid informant, named Calafaty, was jointly indicted and stood trial with John and Robert Rispo and Frank Alamia. After conviction of all defendants on trial, the government disclosed that Ca-

lafaty was a paid government informant, prior to, during and after the trial, and moved on that basis to dismiss the charges against him. Until the disclosure, neither the other defendants, their counsel, the trial judge nor the jury were aware of Calafaty's role, or of the fact that he was in reality a sham defendant. The Court ruled that a new trial was mandated on "due process" grounds even though there was no proof of actual prejudice. Although the decision took into account many factors, during the trial the Court primarily based its finding of a "due process" violation upon the knowing deception of the government in placing a sham defendant on trial with others, coupled with the obvious intrusion into the defense camp and the attorney-client relationship by placing the parties on trial together. Unlike the present case, the intrusion in *Rispo* was clear cut, in that co-defendants and their counsel went to trial together with an unknown informant. Mr. Allen, the informant in this case, was never charged with participation in the Mr. Living Room arson, did not stand trial with any of the present defendants, and never had any contact or discussion with defendants' attorneys. In the present case there was no intrusion into the attorney-client confidences or relationship.

In *United States v. Levy*, 577 F.2d 200 (3d Cir. 1978), an attorney during a portion of the pretrial proceedings represented both a paid government informant and a co-defendant. When the attorney became aware of the situation, he withdrew his representation of the informant, but continued to represent the co-defendant. The district court found that the Drug Enforcement Agency, prosecuting the case, at all times knew that the informant's attorney also represented the co-defendant and "attempted to obtain information about the present matter and, at the very least, did learn that the defense strategy would be to concentrate on the credibility of two key government witnesses." *Id.* at 204. The Court stated at 208:

> Where there is a knowing invasion of the attorney-client relationship and where confidential information is dis-

closed to the government, we think there are overwhelming considerations militating against a standard which tests the sixth amendment violation by weighing how prejudical [sic] to the defense the disclosure is.

In the present case there never occurred any invasion of any attorney-client relationship. In addition, no information was ever disclosed to the prosecution team, although certain information obtained from the defendants was disclosed to investigating governmental officials who were carefully isolated from and did not divulge such information to any of the governmental officials who were prosecuting the charges against the defendants.

In *O'Brien v. United States*, 386 U.S. 345, 87 S.Ct. 1158, 18 L.Ed.2d 94 (1967) and *Black v. United States*, 385 U.S. 26, 87 S.Ct. 190, 17 L.Ed.2d 26 (1966), there were electronic surveillances, discovered after conviction, of conversations between defendants and their attorneys during trial preparation. These surveillances were described in *Weatherford v. Bursey*, 429 U.S. 545, 551, 97 S.Ct. 837, 841, 51 L.Ed.2d 30 (1977), as "plainly illegal under the Fourth Amendment."

The informer was present during attorney-client conferences in *Hoffa v. United States*, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966). The Court did not expressly rule whether such an intrusion would have invalidated the subsequent trial.

The issues involved in *Coplon v. United States*, 191 F.2d 749 (D.C.Cir.1951) and *Caldwell v. United States*, 205 F.2d 879 (D.C.Cir.1953), arose out of overheard conversations between the defendants and their attorneys concerning matters directly related to and occurring during the trial.

■ Defendants contend that certain disparaging remarks made by Allen concerning the ability of one of the defense attorneys, describing him as a "bum," constituted an intrusion into the attorney-client relationship similar to that condemned in *United States v. Morrison*, 602 F.2d 529 (3d Cir.

1979). In *Morrison* there were repeated attempts of government D.E.A. agents (not, as in this case, an informant), to talk with defendant in the absence of her attorney, even though she requested that he be present, to question her about the attorney-client relationship, to urge her to obtain a public defender instead of her privately retained lawyer, and to suggest that if she cooperated, they could recommend sentence. The Court described the conduct as "a pattern of conduct calculated to intrude upon and destroy the attorney-client relationship." Clearly, the present case does not closely resemble the *Morrison* situation. In the present case, even if the informant did call one of the defense attorneys a "bum," it occurred during conversation, was not authorized by government agents, was not made for the purpose of causing defendant to change counsel or to provoke discord in the defense strategy, and had no effect on the trial and caused no change of counsel.

Defendants further contend that Mr. Allen advised Mr. McDonnell, during the trial, not to testify in his own behalf; and that such activity constituted an illegal intrusion into the defense camp requiring a dismissal of the indictment as to all defendants. Whether Mr. Allen was present during the trial as a spectator and whether he advised Mr. McDonnell not to testify are disputed factual issues, as to which I have found against defendants' contentions.

Without going into a long discussion of the reasons for my conclusion on these factual issues, I will simply note that Mr. McDonnell is the only person who testified that Mr. Allen so advised him. Mr. McDonnell also testified that he, Mr. McDonnell, was in no way a member of the conspiracy. The jury found that he was a co-conspirator, based on solid evidence. Mr. McDonnell's testimony is not worthy of belief. Although the testimony is corroborated as to Mr. Allen's presence as a spectator during the trial on at least one occasion, even that testimony is subject to considerable doubt. Mr. Allen directly denied being present and directly denied advising Mr. McDonnell not to testify. Other persons who testified did not observe Mr. Allen in

court, and on at least one occasion when Mr. McDonnell claims that Mr. Allen was in court, there was strong evidence that he was engaged elsewhere in another investigation.

Even if Mr. McDonnell's testimony were credible, it seems obvious that he was not persuaded or induced to refrain from testifying by anything that Mr. Allen may have told him. In his testimony, he was very vague as to the effect, if any, this had on his decision not to testify. The most realistic interpretation of Mr. McDonnell's testimony is that he did not testify because none of the other defendants were going to testify, and he was afraid that if he testified he might harm Ralph Natale's defense. He specifically stated at the hearing that he did not change his mind about testifying at the trial because of what Mr. Allen said to him.

█ I conclude factually that Mr. Allen did not advise Mr. McDonnell against testifying. Consequently, the question of whether a government informant's unsolicited act of advising a criminal defendant not to testify in his own behalf constitutes an intrusion into the defense camp, within the rule of *United States v. Morrison, supra,* need not be decided. It should be noted, however, that there is no evidence that any government law enforcement official or any member of the prosecution team ever requested or suggested that Mr. Allen give such advice to any defendant. On the contrary, Mr. Allen was consistently instructed by those law enforcement agents who were supervising his activities, to avoid, as much as possible, all mention of the Mr. Living Room arson case, and to avoid any involvement in any defense strategy meetings or discussions concerning trial tactics.

█ The use of confidential informants and undercover agents in covertly securing evidence by stratagem or deception, subject to the protection of the Bill of Rights, is well recognized and not disputed by defendants. *Lewis v. United States,* 385 U.S. 206, 208–09, 87 S.Ct. 424, 425–26, 17 L.Ed.2d 312

(1966). The government is not precluded from continuing its investigation and utilizing confidential informants as to defendants' activities, post-indictment, provided there be no infringement of the constitutional rights of a defendant. As the Supreme Court stated in *Weatherford v. Bursey*, 429 U.S. 545, 557, 97 S.Ct. 837, 845, 51 L.Ed.2d 30 (1977):

> We have also recognized the desirability and legality of continued secrecy even after arrest. *Roviaro v. United States*, 353 U.S. 53, 59, 62 [77 S.Ct. 623, 627, 628, 1 L.Ed.2d 639] (1957).

*Weatherford* is the Supreme Court's most recent decision on the major issues in this case. *Weatherford* was a section 1983 civil rights action. It has been applied and interpreted by the Court of Appeals for the Third Circuit, most notably in *United States v. Levy*, 577 F.2d 200 (3d Cir. 1978), and *United States v. Morrison*, 602 F.2d 529 (3d Cir. 1979). In *Levy*, as noted earlier, the Court stated:

> Where there is a knowing invasion of the attorney-client relationship *and* where confidential information is disclosed to the government, we think there are overwhelming considerations militating against a standard which tests the sixth amendment violation by weighing how prejudical [sic] to the defense the disclosure is.

*Id.* at 208 (emphasis added). The Court went on to state that:

> We think that the Court [in *Weatherford v. Bursey*] was suggesting by negative inference that a sixth amendment violation would be found where, as here, defense strategy was actually disclosed *or* where, as here, the government enforcement officials sought such confidential information.

*Id.* at 210 (emphasis added).

In *Morrison, supra* at 536, the Court of Appeals quoted with approval from *Levy* at 209:

> We think that the inquiry into prejudice must stop at the point where attorney-client confidences are actually disclosed to the government enforcement agencies responsible for investigating and prosecuting the case.

Irrespective of whether the test is disjunctive or conjunctive, there was in the present case no sixth amendment violation. There was no attempt to seek out confidential attorney-client information or defense strategy. On the contrary, the law enforcement officials made every reasonable, responsible effort to avoid overhearing or obtaining such information. Even if Mr. Allen, on his own initiative, had intentionally sought out such information, which he did not, this would not alone constitute disclosure to the government. In *Weatherford*, 429 U.S. at page 556, 97 S.Ct. at page 844, the Court expressly rejected the contention that the government's confidential informant, Weatherford, was a member of the prosecuting team as not being a "realistic assessment of the relationship of Weatherford to the prosecuting staff or of the potential for detriment to Bursey or benefit to the State that Weatherford's uncommunicated knowledge might pose." As in *Weatherford*, I have found, and there is no evidence to the contrary, that, except as to Exhibits G–5 and G–5A (the source of which information may or may not have emanated from contact with one or more of the defendants), no information ever obtained by Mr. Allen, from whatever source, was ever disclosed to any member of the prosecution team, prior to sentencing. Certainly none of the facts set forth in G–5 and G–5A were obtained through any intrusion into confidential communications between any of the defendants and any of their attorneys.

I think it is clear on the basis of the decided appellate cases that there was no intrusion or invasion into any attorney-client confidences, and no attempt to so intrude; there was no illegally or improperly secured information; and there was no disclosure of any attorney-client confidences or defense strategy to any member of the governmental prosecution team. Similar to *Weatherford* at 558, 97 S.Ct. at 845:

> There being no tainted evidence in this case, no communication of defense strate-

gy to the prosecution, and no purposeful intrusion by Weatherford, there was no violation of the Sixth Amendment insofar as it is applicable to the States by virtue of the Fourteenth Amendment.

██ Throughout the trial, some of defense counsel expressed suspicion that one or more of the defendants on trial was a government informant and a sham defendant in the same context as described in *United States v. Rispo.* Consequently, defense counsel asked government counsel whether there were additional recordings or attempts to record any defendant. The government's always careful responses were that there was no *Rispo*-type informant, that there were no tapes in reference to the present case or taken during the course of the conspiracy except those that would be used in evidence and had been made available to defendants. It is now clear that there did not exist any *Rispo*-type activity in this case, and defense counsel do not presently contend that there was. The present contention is that the answers given by the government counsel were misleading because of the continuing surveillances by Mr. Allen.

This contention has never before, to my knowledge, been raised in this case. I do not understand the Court of Appeals' mandate on remand to include this issue. However, in order to avoid further needless procedural delays, I conclude that there was no misrepresentation and, in addition, since no *Rispo* situation existed, there was no sixth amendment or other constitutional violation and no prejudice or unfairness even if counsel were misled by the government's response.

██ A careful reading of the transcript of the trial will establish that the government attorneys' answers were factually accurate and correct. In light of *Rispo*, defense counsel had the right to ask for and receive answers as to whether any defendant was recording activities of other defendants. None were. To say, however, that during a trial, defense counsel has the right to learn whether government agents are recording a defendant in other unrelat-

ed ongoing investigations is an entirely different matter. In any event, the trial judge did not direct the government to answer these broad questions. That ruling was not challenged on appeal.

It is now known that Mr. Allen made tape recordings of Mr. Natale and Mr. McDonnell after Mr. Allen became a cooperating witness. The government's prosecuting attorney, Mr. Pichini, was made aware, prior to trial, that a decision had been made by the government to attempt to make such recordings in order to continue with various ongoing investigations unrelated to the Mr. Living Room arson case. Beyond that fact, however, Mr. Pichini knew nothing of the activities of Mr. Allen. He did not know whether any recordings had been made, or even whether any attempts were made. He did not know what, if any, contacts Mr. Allen had or was continuing to have with either Mr. Natale or Mr. McDonnell. He was unaware of the application and proceedings before Judge Broderick. His first actual knowledge of the situation was when the proceedings before Judge Broderick were released from the impoundment order, subsequent to the date of sentencing.

██ Finally, it is obvious that defendants were in no way prejudiced by any statements made by government counsel. Although a knowing intrusion into the attorney-client relationship and a disclosure of confidential information to the prosecution may constitute a sixth amendment violation irrespective of prejudice, *United States v. Levy, supra,* alleged incorrect answers or representations by government counsel to defense counsel must at least be shown to have produced some trial prejudice in order to authorize post-conviction relief.

I conclude that there was no *Rispo* sham defendant intruding into defense strategy, no *Levy* type of joint representation of a defendant and an unknown informant, no illegal overhearings of conversations between attorneys and their clients as in *O'Brien* and *Black,* no overheard attorney-client conversations directly related to the

trial as in *Coplon* and *Caldwell*, no informant sitting in on trial strategy conferences between defendant and his attorney as in *Hoffa* and *Weatherford*, and no "pattern of conduct calculated to intrude upon and destroy the attorney-client relationship" as in *Morrison*. I find no basis in law for overturning the convictions or granting any post-trial relief.

██ The government had a continuing duty to investigate by available legal means the suspected continuing criminal activities of Mr. Natale and those with whom he was associated. The government, by isolating the prosecution team and completely insulating it from any information that might be ascertained, whether or not pertaining to the Mr. Living Room arson case, protected fully and completely the rights of the defendants. The fact that Mr. Allen, a government informant, had contacts, associations and conversations with two of the six defendants, Mr. Natale and Mr. McDonnell, subsequent to the return of the indictment did not change or alter in any way, however slight, the course of the trial. Defendants do not, as I understand it, even contend that the government's challenged activities had any actual effect on the trial. In essence, their argument, as I see it, is that all of the defendants' convictions should be set aside as some sort of retribution for the conduct of the government in continuing its lawful investigation into ongoing criminal activities.

During the course of the hearing it was disclosed that the government might have received some information from one or more confidential informants other than Mr. Allen during the period July 10, 1978 through January 12, 1979 (from the return of the indictment through the date of sentencing). At the hearing, I declined to receive this information and to review it in camera to determine if it should be disclosed to defense counsel. However, upon further consideration, an order was entered on December 4, 1979, directing the government to search its files and to provide for in camera inspection any such material. In response thereto, the government filed affidavits which establish that two pieces of information were received from one or more confidential informants concerning the Mr. Living Room arson and/or activities of one or more of the defendants. The affidavits further averred that none of this information constituted admissible evidence, disclosure of confidential attorney-client relationships, legitimate defense strategy, or *Brady* material. The first piece of information was received by the FBI prior to the trial, but was not divulged, either directly or indirectly, to any member of the prosecution team. Thus, it could have had no effect on the trial or any subsequent proceedings. The second piece of information was obtained after the jury had returned its verdict and thus could not have affected the outcome of the trial. The information was provided to David Seel but was not utilized in the sentencing or post-trial proceedings. In addition, it is my conclusion that even if all of the information gathered through these other confidential sources had been made known to the prosecution team, it would have violated no rights of any of the defendants.

██ Because these documents are sensitive, in that the government has a valid interest in protecting its confidential sources of information, its refusal to disclose the information to defense counsel is justified. After an in camera inspection, I decline to direct the government to disclose to defense counsel the matters submitted in response to my December 4, 1979 order. The documents will be sealed and impounded for purposes of appellate review.

The defendants stand convicted and sentenced for serious federal offenses. There is no reasonable doubt as to their guilt. The Court of Appeals found no trial error. The only issue presented on remand is whether, despite the defendants' clear guilt, improper governmental activity requires that the conviction be invalidated. I conclude that there was no improper governmental activity. Consequently, no relief is appropriate. Further delay in carrying out the sentences imposed is not in the interests of justice or the public, and is not warrant-

ed in this case. An order directing the defendants to surrender for the commencement of their respective sentences of imprisonment is attached.

To the extent the foregoing "Discussion" contains any factual determinations not set forth under "Findings of Fact," the same shall be deemed as additional Findings of Fact.

## ORDER

Pursuant to the mandate of the United States Court of Appeals for the Third Circuit, an evidentiary hearing has been held and findings of fact and a decision have been rendered to the effect that there was no violation of any of the defendants' rights, and specifically no intrusion into the attorney-client relationship, or the defense camp or trial strategy; it is therefore

ORDERED, ADJUDGED and DECREED that all post trial relief be and hereby is DENIED; and it is further

ORDERED that the defendants surrender themselves to the designated institutions for the commencement of the sentences of imprisonment imposed, on or before 12:00 o'clock Noon, Wednesday, January 16, 1980. If the Attorney General or his authorized agent has not designated an institution as of that date, defendants shall surrender to the United States Marshal at the Marshal's office in the United States Courthouse, 601 Market Streets, Philadelphia, Pennsylvania, on or before 12:00 o'clock Noon, Wednesday, January 16, 1980.