UNITED STATES of America

v.

Abraham SLOCHOWSKY, Philip Holzer, David Gold, and Alvin Donnelly, also known as "Kenneth Aska", Defendants.

UNITED STATES of America

v.

Henry KATKIN and Abraham Slochowsky, Defendants.

UNITED STATES of America

v.

Bruce ELLIOTT and Abraham Slochowsky, Defendants.

Nos. CR–83–00178, CR–83–00179 and CR–83–00233.

United States District Court, E.D. New York.

Dec. 8, 1983.

Raymond J. Dearie, U.S. Atty., E.D.N.Y., Brooklyn, N.Y., for plaintiff; Max Sayah, Asst. U.S. Atty., Brooklyn, N.Y., of counsel.

Jacob R. Evseroff, Brooklyn, N.Y., for defendant Abraham Slochowsky.

Edward M. Rappaport, New York City, for defendant Bruce Elliott.

BARTELS, District Judge.

Defendants Bruce Elliott and Abraham Slochowsky move to dismiss Indictment

No. CR–83–00233 on the ground that the government deprived them of their rights under the Fifth and Sixth Amendments by using Joseph Bald as an informant while Elliott, Slochowsky and Bald were co-defendants in two state criminal proceedings. In other words, they claim that the information received from Bald was tainted. Slochowsky makes this same motion with respect to related Indictments Nos. CR–83–00178 and CR–83–00179. The court held a two-day evidentiary hearing at which the government offered the testimony of Bald, Max Sayah, who is an Assistant United States Attorney for the Eastern District of New York, and former Assistants Peter Sudler and Lawrence Ruggiero of the Southern District. The defendants presented no witnesses.

## FACTS

On June 27, 1980, Bald, Elliott and Slochowsky were indicted in Kings and Bronx Counties for arson and related offenses. Nine months earlier Bald had been indicted for arson in Queens County, for which he was convicted on December 11, 1980. On September 15, 1980, Bald was released on bail and approximately two weeks later Bald's attorney contacted Sudler in the Southern District to offer his client's cooperation in exchange for assistance with Bald's state indictments.

Bald met with Sudler in early October and spoke about his past participation in arson activities along with others, including Elliott and Slochowsky. Bald also offered information concerning other criminal activities such as political corruption and securities fraud. On January 5, 1981, Bald entered into a formal cooperation agreement with the Southern District requiring Bald to plead guilty to a single count under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 *et seq.* ("RICO"), conditioned upon concessions in Bald's favor by the Queens, Bronx and Kings Counties District Attorneys. After a series of meetings between Bald and the state prosecutors held in the Southern District, the state prosecutors refused to cooperate and Bald's agreement with the Southern District became inoperative.

At the time of Bald's release on bail in September, 1980, Bald and Slochowsky were dissolving their real estate partnership and vacating their Brooklyn office. Bald had not had any significant communications with Slochowsky or Elliott since their joint indictments in June, 1980. In the course of vacating their office, Bald retained some partnership records and others Slochowsky kept. Shortly before his meeting with Sudler, Bald learned from Slochowsky and another partner (Stanley Zahner) that Slochowsky was planning to move records to the basement of a laundromat Slochowsky owned in Queens, then under construction. Shortly after his first meeting with Sudler, Bald visited the laundromat along with Slochowsky. Bald first told F.B.I. agents in the Southern District about the storage of partnership records at this location in July or August of 1981.

In late 1980 or early 1981, Bald met with Elliott, an associate and past business partner, and obtained from him a list of thirty-eight buildings owned and burned down by Harry Rosen, who was the principal witness against Bald, Elliott and Slochowsky in the state proceedings. Bald testified that Elliott "volunteered" the list. He also testified that he had been "curious to know what buildings [Rosen] was involved in." In either event, there is no evidence that Bald obtained the list at the Southern District's behest or that the buildings listed had any relevance to the instant indictments. In February or March of 1981 Bald gave the list to the Kings County District Attorney in the course of their unsuccessful negotiations and in mid-1981 he gave the list to the Southern District.

In the spring of 1981 Sudler asked Bald whether Elliott might be willing to cooperate in exchange for assistance with Elliott's state indictments. In June of 1981 Bald told Elliott that through an intermediary he

had learned that the Southern District was interested in obtaining Elliott's cooperation. F.B.I. agents, who had been working with Sudler and Bald, instructed Bald to ask Elliott about evidence he might have concerning political corruption. In response to Bald's inquiries, Elliott indicated that he did have such information but did not give any specifics. Bald did not ask, nor had he been instructed to ask, about any of the properties involved in the pending state indictments or later involved in the indictments herein.

A few days after Bald approached Elliott in June, 1981, Elliott met with Sudler and had a general discussion concerning the possibility of a cooperation agreement. Elliott's attorney thereafter spoke with Sudler but broke off further negotiations when informed by Sudler that the Bronx and Kings Counties District Attorneys would probably not go along with any agreement struck between Elliott and the Southern District. At no time did either Bald or Sudler tell Elliott that Bald was an informant, although Sudler assumed that Elliott knew.

Despite the nullification of Bald's cooperation agreement, Bald acted as an informant under the F.B.I.'s direction, often wearing a secret transmitter or "wire" to aid primarily in the investigation of economic crimes. Bald had not worn a wire when he spoke with Elliott concerning cooperation with the Southern District.

Bald participated, along with Elliott and Slochowsky, in court proceedings in Bronx and Kings Counties on numerous occasions in 1981 and 1982. Starting in late January, 1982, the Kings County Supreme Court conducted audibility hearings in connection with tapes secretly made by another informant, Harry Rosen. Bald was present at those hearings. On March 2, 1982, after the hearings ended, Bald entered a cooperation agreement with the Kings County District Attorney and the following day Bald pleaded guilty *in camera* to various counts of two indictments against him in Kings County. Bald's plea was kept secret to protect his status as an informant for the Kings County District Attorney and the Southern District. Elliott and Slochowsky learned of Bald's secret plea and cooperation agreements in early July, 1982, in the course of the Bronx criminal proceeding. Between March 2, 1982 and July, 1982, Bald was under instructions from the Kings County District Attorney not to discuss pending cases with Elliott and Slochowsky.

In late October or early November of 1982, Bald's attorney contacted Sayah in the Eastern District to offer Bald's cooperation in exchange for assistance with Bald's state cases. By this time Bald had been sentenced to serve 8⅓ to 25 years in prison by the Queens County Supreme Court, and Bald desired to remain incarcerated in a federal facility. Bald met with Sayah and described approximately forty arsons that occurred between 1976 and 1979, naming twenty individuals as participants, including Elliott and Slochowsky, along with himself. At this time the Southern District sent their files to the Eastern District. Sayah received no information or documents from the Kings County District Attorney other than copies of tape recordings made by Harry Rosen. Bald told Sayah about the partnership records stored in the basement of Slochowsky's laundromat. Because this information had come from Slochowsky and Zahner two years before and could be considered stale, Sayah had Bald place a tape-recorded telephone call to Zahner, who confirmed that the records were still being kept there. On November 18, 1982, a search warrant was executed and the partnership records of Bald and Slochowsky were seized. Bald testified before the grand jury in the Eastern District between March and May of 1983 and the grand jury returned the indictments naming Elliott and Slochowsky on April 27 and May 25, 1983. A graphic illustration of the chronology of events is set forth in the attached appendix.

## DISCUSSION

The parameters of the defendants' right to counsel as well as the contours of due

process are not always clear and exact. Defendants charge that the Southern and Eastern Districts, in concert with the Kings County District Attorney, engaged in a systematic pattern of Fifth and Sixth Amendment violations by using Bald as an informant and that the indictments herein were the product of tainted information. Their Sixth Amendment claim is twofold: (1) that the government deliberately intruded into the attorney-client relationship and thereby obtained privileged information, *Weatherford v. Bursey*, 429 U.S. 545, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977), and (2) that the government deprived them of their right to counsel by deliberately eliciting incriminating evidence from them in the absence of counsel, *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). Defendants also allege a violation of their right to a fair trial guaranteed by the Due Process Clause of the Fifth Amendment, the violation stemming from the same circumstances underlying their Sixth Amendment claims.

*Sixth Amendment Claims*

The gravamen of defendants' Sixth Amendment claims is that Bald, in his capacity as informant, elicited incriminating statements from the defendants both with attorneys present and without their presence, and that the Eastern District then used this "tainted" information to obtain indictments. Despite defendants' repeated, conclusory charges of a broad conspiracy among state and federal prosecutors to use Bald as a "spy within the defense camp," their only specific allegations of taint concern the November, 1982 search warrant and the list of thirty-eight buildings given to Bald by Elliott in late 1980 or early 1981. Notably absent is any specific allegation that Bald passed on to either state or federal authorities any privileged attorney-client communications.

■ The Sixth Amendment right to assistance of counsel does not attach prior to the "critical stages" of a prosecution. *United States v. Henry*, 447 U.S. 264, 269,

100 S.Ct. 2183, 2186, 65 L.Ed.2d 115 (1980). Viewing the Eastern District proceedings in isolation, that critical stage did not occur until the indictments charging RICO and mail fraud violations were returned in 1983, almost three years after the state arson indictments and well after defendants learned of Bald's cooperation agreements. Considering the government's conduct solely in relation to the Eastern District indictments, that conduct in no way violated the defendants' Sixth Amendment rights. However, if that conduct is considered in relation to the state indictments for related but distinct state offenses, a serious question is presented as to whether the defendants' rights were violated, assuming wrongful state prosecutorial conduct.

For instance, if Bald had acted as a prosecution spy in the state court proceedings and obtained tainted evidence in violation of the defendants' rights, a question would be raised as to whether such evidence would be barred in a federal prosecution where the federal prosecutor received the same prior to the federal indictment without in any way conspiring or participating in securing such information and without knowledge thereof. In such a case the fruit of the state's illegal conduct would not have been obtained by exploitation by the federal authorities and the information secured would not be subject to the same flaw as if obtained from a federal undercover agent. Whether the government would be able to use such information would depend upon whether the freedom of the federal government to prosecute is constrained by the violation of the defendants' rights by the state government. *See Hoffa v. United States*, 385 U.S. 293, 307–09, 87 S.Ct. 408, 416–17, 17 L.Ed.2d 374 (1966).

■ Considering all the testimony and exhibits in this case, we need not reach this issue. Assuming, as charged by the defendants, that the Southern and Eastern Districts must be treated as one unit, which is open to serious question, *cf. United*

States v. Natale, 494 F.Supp. 1114 (E.D.Pa. 1979), the court finds that (1) neither the Southern nor the Eastern District instructed or used Bald in any way to obtain information from Elliott and Slochowsky, (2) Bald did not pass on to either District any tainted information, and (3) neither District received tainted information from the Kings County District Attorney.

Given these findings, defendants' Sixth Amendment claims may be easily disposed of. First, as to defendants' *Weatherford* claim, that case held "that to establish a Sixth Amendment violation where an informant sat in on defense strategy sessions defendants were required to establish that privileged information had been passed to the government or that the government had intentionally invaded the attorney-client relationship, and resulting prejudice." *United States v. Dien*, 609 F.2d 1038, 1043 (2d Cir.1979). Defendants utterly failed to offer or elicit any evidence of invasion by the government, intentional or otherwise, of defendants' attorney-client relationship, or that the Southern or Eastern Districts received from Bald or the Kings County District Attorney any privileged information. In addition, there has been no showing of prejudice. As stated by the court in *United States v. Pioggia*, No. 82–231, slip op. at 26 (D.Mass. July 29, 1983), "[m]ere speculation about possible benefits derived by the government ... is not enough to show prejudice."

Defendants' *Massiah* claim fails for virtually the same reasons. In *Massiah*, after indictment the government employed the defendant's co-defendant as an agent to whom the defendant made incriminating statements. The Supreme Court held this to be an interference with defendant's right to counsel. 377 U.S. at 206, 84 S.Ct. at 1203. Defendants here have made no showing whatsoever that Bald "deliberately elicited" incriminating statements from Elliott and Slochowsky.

Finally, it should also be noted that even if defendants could identify tainted information learned by Bald at the Government's behest, the usual remedy would not be dismissal of the indictment, but suppression of the tainted evidence. *United States v. Morrison*, 449 U.S. 361, 101 S.Ct. 665, 66 L.Ed.2d 564 (1981).

*Fifth Amendment Claim*

■ Defendants argue that the "totality" of misconduct on the part of state and federal prosecutors has given "the prosecution in this matter an unfair advantage at trial" not to be condoned under the Due Process Clause of the Fifth Amendment. In this connection defendants stress Bald's secret guilty plea in the Kings County proceeding and "sham" retention as a co-defendant therein, apparently on the theory that Bald and his attorney after defendants' state indictments garnered information from defendants and their counsel while posing as, respectively, co-defendant and co-counsel. Since this information had been obtained, if at all, before the Eastern District indictments, the defendants have no semblance of a claim.

As with their Sixth Amendment claims, there is simply no factual basis for these contentions even though Bald's contacts with the defendants were after their state indictments. In addition, there is no evidence that Bald or his attorney learned or passed on any information from Elliott or Slochowsky or their counsel relating to the state indictments or the instant indictments. Nor is there any evidence that any state or federal authorities sought to use Bald or his counsel in this manner. Therefore, defendants' Fifth Amendment claim must be rejected.

Accordingly, defendants' motions to dismiss the indictments must be denied.

SO ORDERED.

## APPENDIX

### CHRONOLOGY

| Date | Event |
|------|-------|
| Sept. 1979 | Bald indicted on arson charges in Queens County. |
| June 27, 1980 | Bald, Elliott and Slochowsky indicted in both the Bronx and Kings Counties on arson charges. |
| Jan. 5, 1981 | Bald enters cooperation agreement with Southern District. |
| Jan.-Feb. 1982 | Audibility hearings conducted in Brooklyn proceeding. |
| Mar. 2, 1982 | Bald enters cooperation agreement with Brooklyn District Attorney. |
| Mar. 3, 1982 | Bald secretly pleads guilty to Brooklyn indictment; Bald is continued on the calendar as a codefendant of Elliott and Slochowsky in order to protect his safety and continue in an informant capacity. |
| Mar.-June, 1982 | Bald has 6–7 meetings with Brooklyn District Attorney; a number of meetings occur between Bald and Elliott and Slochowsky, both with and without attorneys present. |
| July 1982 | Elliott and Slochowsky learn (in the course of the Bronx proceeding) of Bald's informant status. |
| Oct.-Dec., 1982 | Taint hearing conducted in Brooklyn case; suspended upon refusals of certain members of the Brooklyn District Attorney's office to testify; hearings remain suspended pending outcome of appeal regarding subpoena served on District Attorney Holtzman. |
| Nov. 1982 | Bald begins cooperating with Eastern District. |
| Nov. 18, 1982 | Search warrant executed against business records belonging to Slochowsky and Bald; warrant based in large part upon information from Bald, who at this point had begun cooperating with the Eastern District. |
| Apr.-May, 1983 | Indictments returned in the Eastern District. |